## ASHLEY v. KEITH OIL CORPORATION et al.

Civil Action No. 5492.

District Court, D. Massachusetts.
July 31, 1947.

Clifford H. Byrnes, Hale, Sanderson, Byrnes & Morton, and Harold E. Magnuson, all of Boston, Mass., for plaintiff.

Richard C. Reed and Keith, Reed & Wheatley, all of Brockton, Mass., for defendants.

WYZANSKI, District Judge.

#### A. Introductory.

1. This is a stockholder's derivative suit. Plaintiff, a citizen of Connecticut, sues a Massachusetts corporation and a Massachusetts citizen. Her mother and three of her brothers, Howard, Robert and Richard, all citizens of Massachusetts, intervene as plaintiffs. The original plaintiff invokes the asserted power of this Court under the diversity jurisdiction clause of 36 Stat. 1091, 28 U.S.C.A. § 41(1). She alleges that Warren S. Keith, the individual defendant, in his capacity as president, director and controlling stockholder has mulcted and mismanaged the company of which she holds 20 shares of common sock. In particular, she points to what she regards as the failure of the corporation to pay dividends upon preferred stock and to retire it as stipulated in the articles of association, excessive salaries, unauthorized borrowings, improper transactions in the preferred stock of the company, a 1945 settlement of a stockholders' suit to which she was not a party and the failure to abide by the "spirit" of that settlement. She contends that she has vainly sought relief through the normal corporate channels. So now she asks that the individual defendant be surcharged with his improper expenditures, that certain of his stock transactions with the corporation be set aside, that a receiver be appointed for the corporation and that the individual defendant be enjoined from voting the stock he holds.

2. The case raises important problems of corporate law and difficult questions as to the diversity jurisdiction of this court, the choice of state or federal law as governing the disposition of this case, the propriety of appointing receivers who may be required to operate a corporation for several years and the propriety of enjoining a holder of stock from exercising voting rights as a common and preferred stockholder.

3. Because of the confusion in the management and records of the corporation it

40

is impossible to state with confidence the precise details of every transaction. But clarity will be best promoted by first stating the facts with respect to the general history and present status of the corporation, the salary and loan payments to Warren S. Keith, his transactions in the stock of the company, and the 1945 litigation and settlement. Thereafter, the applicable procedural and substantive principles of law will be considered.

### B. History and Present Status of Keith Oil Corporation

4. Keith Oil Corporation is a Massachusetts business corporation. It is engaged in the marketing and transportation of gasoline and oil, as well as in the installation and servicing of equipment that uses oil for heat and fuel.

5. The corporation was organized as a family enterprise in 1917 by the late Warren R. Keith who died in January, 1938. He was the husband of the intervening plaintiff, Mrs. Elizabeth St. John Keith, and the father of the individual defendant, Warren S. Keith, of the original plaintiff, Mrs. Lillian Keith Ashley, and of the intervening plaintiffs, Howard C. Keith, Richard H. Keith and Robert D. Keith.

6. Before his death Warren R. Keith used the corporate funds as though they were his personal funds. He, his wife, his sons and his daughter, the plaintiff here, used various corporate assets (such as gas in the case of Mrs. Ashley) for their personal benefit. While following such unorthodox methods, Warren R. Keith gradually gave the preeminent authority in the corporation to his eldest son, Warren S. Keith, a man more distinguished for his military record in World War I and for his civic reputation than for his training in business, accountancy or law. It was the father's apparent intention that the eldest son should be vested with the authority and privileges that the elder Keith had exercised.

7. As originally organized, Keith Oil Corporation had 1600 authorized and 820 issued shares of common stock each of a par value of $100. Of these the senior Keith retained 421. He gave 319 to his son Warren S. and 20 each to his other four children, Howard C., Richard H., Robert D., and Lillian Keith as she then was. Each of the children has continuously retained his original shares. The 421 shares which belonged to Warren R. Keith he left as a legacy to his widow, who still holds them. Hence, one may say that as a practical matter the holdings of common stock have not shifted from the time that the corporation was organized in 1917 until the present.

8. In the 1930's the corporation became financially embarrassed. It filed in this Court a petition for corporate reorganization under the then provisions of § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The corporation's reorganization was completed by a final decree of this Court dated November 22, 1938.

9. In substance, the reorganization converted the principal former creditors of the corporation into preferred stockholders. The amended articles of association authorized 15,000 shares of $10 par, 5% cumulative prior preferred stock. Only 9,531 shares were issued.

10. Among the principal original holders of this stock, all of whom had been creditors, were—

| | |
|---|---|
| Bay Oil Co. | 1,487 shares |
| Brockton National Bank | 500 shares |
| Eastern Oil Co. | 589 shares |
| Goodrich Oil Co. | 2,659 shares |
| J. C. Keith (a cousin) | 635 shares |
| Warren S. Keith | 149 shares |
| Hon. Harry K. Stone | 1,958 shares |

11. The amended articles of association had five important provisions. (a) The preferred stock should be entitled to cumulative dividends of 5% payable out of profits. (b) In 1939 and 1940 75%, and in subsequent years 100%, of the profits left after the payment of the preferred dividend should be used to retire or redeem preferred stock at par, provided that after the retirement at par of 5% of the preferred stock in any one year the corporation should be permitted to purchase at a discount from par other preferred stock offered to the corporation, after notice to and tender by preferred stockholders. (c) All voting power should be originally vested in the

common stockholders, but should be transferred to the preferred stockholders whenever and for so long as the company was in default either in the payment of any two semi-annual dividends on preferred stock or in the stipulated retirement of preferred stock. (d) Directors elected by preferred stockholders after a default should have the power to revise officers' salaries. (e) So long as the preferred stock was outstanding, the aggregate salaries of all officers of the corporation should be not more than $12,000 annually.

12. Upon reorganization, Warren S. Keith became the president and treasurer of the corporation; Robert D. Keith, vice-president and Howard C. Keith, assistant treasurer. Those three and Richard H. Keith became directors.

13. The corporation earned net profits every year following its reorganization. In 1939, $4,938.75. In 1940, $3,374.47. In 1941, $4,616.27. In 1942, $4,912.10. In 1943, $3,604.48. In 1944, $7,443.56. In 1945, $286.50. In 1946, $5,361.53. For the 8 years the total profits were $34,537.66.

14. In accordance with the amended articles of association, the corporation declared and paid dividends upon the preferred stock for the two semi-annual periods, (a) September 20, 1938, to March 20, 1939, and (b) March 20, 1939, to September 20, 1939. The latter dividend was actually paid March 31, 1940, Since then no regular dividends have been declared or paid upon the preferred stock. Nonetheless, in the first two months of 1941 the corporation paid an amount equivalent to a preferred stock dividend to three holders of preferred stock: to Crane Co. $17.50; to Eastern Oil Co. $147.25; and to Mrs. Keith $166.25. In 1945 it made a similar payment of $24.

15. The corporation, after notice to preferred stockholders, acquired for the treasury on September 30, 1939, for $5,000 the 500 shares of preferred stock theretofore owned by Brockton National Bank. This was the only redemption which purported to accord precisely with the provisions of the amended articles of association.

16. The corporation appears to have become in default to the preferred stockholders in 1940 for failure to redeem stock on the terms provided in the amended articles of association. But because of the Goodrich Oil Co. transaction referred to in paragraph 35 below the default was ambiguous. At any rate, the corporation had become in default by March 31, 1941 by its failure to pay two semi-annual dividends.

17. Thereafter and continuously until the present time the exclusive voting power has been vested in the preferred stockholders.

18. On April 9, 1942, the preferred stockholders elected as directors two men of their particular choice, Richard Reed and Kenneth Dorn, as well as the then attorney for the company, Walter McDonald, and Warren S. Keith and Richard H. Keith. The board remained the same until February 27, 1945, when Reed (who had entered the armed service in 1943) and Dorn were dropped, the others continuing. Since January 14, 1946, the board has consisted of Warren S. Keith, his wife, Laura B. Keith, and his brother-in-law, Clayton A. Bemis.

19. Since, as before, the vesting of voting power in the preferred stockholders, Warren S. Keith has, with the exception of a short period, continuously served as president and treasurer. In those capacities he has been the managing executive officer.

20. His brother, Howard Keith, ceased to be an officer after he entered the army on November 25, 1940. He was, however, employed for a few months in 1945 as an employee at $75 a month. Another brother, Richard H. Keith, ceased to be active in the business after he became employed by the Bethlehem Shipbuilding Corporation in March, 1942. However, he continued as an unpaid vice-president, assistant treasurer and clerk until January 14, 1946. The other brother, Robert D. Keith, was vice-president between January 11, 1938, and January 15, 1941. After he was called to active service in the National Guard in January, 1941, he never served as an officer or employee of the company.

21. In the period between 1938 and the present the books of the corporation and its affairs have been under the complete direction of Warren S. Keith. During the war years, the three younger brothers were as a result of their respective services in the

army, in the national guard and in a shipyard, not concerned with and were not aware of the details of the business. However, they were never denied access to the records. And on their return from war services in the fall of 1945, they in fact examined the records of the corporation and became fully informed of all the 1938–1945 transactions which have been referred to in the trial of this case and which are referred to in this opinion.

### C. Salary and Loan Payments to Warren S. Keith.

22. After the reorganization, the corporation never paid in any one year aggregate officers' salaries in excess of the stipulated $12,000 annually.

23. The salaries paid to Warren S. Keith as officer and director were: in 1938 (prior to the reorganization) $6,286.24; in 1939, $3,381.36; in 1940, $3,000; in 1941, $3,000; in 1942, $3,000; in 1943, $3,000; in 1944, $5,000; in 1945, $5,000 and in 1946, $6,000.

24. There is no claim that the salaries paid to Warren S. Keith prior to 1944 were in excess of the fair value of his services or in excess of authority conferred by the directors or stockholders.

25. In considering the 1944 salary of $5,000, the starting line is the first of two votes passed by the directors January 15, 1941. Under its terms "the salary of any officer of the Corporation shall not exceed $3,000 per year." Warren S. Keith contends that the directors in 1944 superseded that vote and gave him oral authority to increase his own annual salary to $5,000 beginning that year. But his brother, Richard, who was the clerk and a director denies that such authority was given. No testimony on the point was forthcoming from the three other directors, McDonald, Reed and Dorn. Therefore, I find that in 1944 neither the stockholders nor the directors authorized the corporation to pay Warren S. Keith more than the $3,000 annual salary which he had been receiving since 1941. No doubt the services of Warren S. Keith in 1944, particularly in the absence of his brothers in war service and in view of the shortage of other help, were more valuable than his services were in 1941. But he had

agreed to serve at the figure of not more than $3,000 annually. And that was not an unconscionable agreement. It follows that Warren S. Keith without corporate authority diverted $2,000 in salary to himself in 1944.

26. By the settlement agreement of November, 1945, more fully explained in paragraphs 67-69 below, the directors of the corporation, the mother and the four brothers agreed that as of 1945 and thereafter the corporation should pay Warren S. Keith an annual salary of $5,000. In view of the salary he had received prior to 1939, in view of his increased duties and in view of changes in the cost of living and general standard of compensation, $5,000 was not in excess of the fair value of Warren S. Keith's services to the corporation. The agreement was presented to and approved by the directors on November 6, 1945. In approving the agreement the directors purported to exercise corporate authority to sanction a $5,000 annual salary for Warren S. Keith. The action was reasonable.

27. January 16, 1946, the directors voted to increase Warren S. Keith's salary to $6,000 annually. The factors of salary payments to him prior to reorganization, his increased corporate duties, higher costs of living and altered general standards of compensation in the community warranted the directors in making the $1,000 increase.

28. In the years between 1938 and 1946 when Warren S. Keith was receiving lower salaries than he had been accustomed to, and when he and the other officers were bound (as indeed they still are) by the restrictions in the amended articles of association limiting to $12,000 annually aggregate corporate officers' salaries, Warren S. Keith indulged in the habit of withdrawing sums from the corporate treasury and charging these loans to himself.

29. Some of these loans were in the form of withdrawals of cash for Warren S. Keith personally. Others were in the form of payments by the corporation of Warren S. Keith's personal bills for taxes, life insurance, household needs, club dues, church contributions and other miscellaneous matters. As will appear later, Warren

S. Keith purported to repay all or part of these loans from time to time by surrendering preferred stock of the corporation. The circumstances and the propriety of Warren S. Keith's transactions in and surrenders of preferred stock are considered in paragraphs 33-60 below. For the moment attention is directed to the fact that at the end of several years the loans outstanding and not purported to be repaid by surrenders of preferred stock were often quite large: In 1939, $2,800 plus $330.65 or a total of $3,130.65 [Ex. 2, pp. 10, 11, 20]; in 1940, $4,065.56; in 1941, $3,525.36; in 1942, $4,721.66; in 1943, $8,632; in 1944, $3,004.18; in 1945, $101.03; and in 1946, $46.40.

30. In considering these items, the first point to be noted is that when these loans were made a full and accurate record was kept on the corporate books. Moreover, the practice of family loans was as old as the corporation itself. The mother and all the four sons had repeatedly engaged in the practice. They had used corporate funds for personal taxes, personal mortgage interest, club dues, a radio and even an airplane. Indeed the latest balance sheet, as of December 31, 1946, shows that Mrs. Keith and all the brothers are borrowers on open account in amounts considerably larger than is owed by Warren S. Keith. As of December 31, 1946, he owed $46.40; Robert D., $379.93; Howard C., $405.40; Richard H., $255.81 and Mrs. Keith, $2,004.75. Such borrowing was an old family custom that must have been known to and acquiesced in by the plaintiff. However, (unless the open account she once enjoyed for gasoline for her own car be an exception), it is not shown that she received similar loans herself.

31. Moreover, this type of borrowing was known to the directors. In their second vote of January 15, 1941, they provided "that any additional salary [above $3,000 annually] drawn by any officer shall be charged to the account of such officer. Such addition shall be offset at some future date by the surrender of preferred stock to the Corporation by that officer." However, it is to be borne in mind that when the vote was passed the only directors were the four brothers, all of whom were potential beneficiaries of the system. After independent directors were added in 1942, the directors as of July 14, 1943, voted that "no officer of the Corporation shall be allowed to borrow money from the Corporation."

32. Despite the exculpatory considerations to which reference has been made, this borrowing practice was always, that is before July 14, 1943, as well as after, indefensible. It affected persons outside the family who owned preferred stock and who are not shown to have acquiesced in the family indulgences. Family borrowing as enjoyed by the Keiths prejudiced these outsiders in several ways. The loans were made to persons of something less than superior credit rating. Thus they might in a moment of disaster prove unsound assets for preferred stockholders, not to mention creditors. Equally important, the loans carried no interest. If the money had not been withdrawn by Keith from the corporate treasury for personal purposes, it could have been used for various corporate purposes. For instance, it could have been used to reduce a $28,000 mortgage which the corporation had given to the White Fuel Corporation. Or to pay accumulated dividends on the preferred stock. Or to redeem preferred stock. Or to buy needed equipment to maintain or expand the business. Such uses would have benefited the preferred stockholders. Their rights to dividends and to redemption depended upon corporate net profits. And their rights were not being realized. Moreover, such uses would have benefited the common stockholders. The common stockholders are always interested in the maximum profitable use of corporate assets, for their opportunity to receive a return on their money is not limited like that of a creditor or preferred stockholder. It expands with the profitableness of the enterprise. Moreover, in this case the common stockholders had a special reason to want all available funds used for payment of the arrears on preferred stock dividends and for the redemption of preferred shares. Until the corporation was current in its fulfillment of the obligations to preferred stockholders, the preferred and not the

common stockholders would have the control of the corporation.

### D. Preferred Stock Transactions of Warren S. Keith.

33. It will be recalled that after the reorganization was completed in 1938, 9,531 shares of preferred stock had been issued. [See par. 10, above.] With the exception of 149 shares owned by Warren S. Keith, almost all were originally in the hands of persons who were not in the immediate family circle and who had been creditors. In the last eight years, 7,867 shares have been acquired by the corporate treasury. Now there are outstanding 1,664 shares of preferred stock. Of these Warren S. Keith owns 850, that is, a majority. The three other brothers and the mother, who are the intervening plaintiffs, own 644 shares. Outsiders, formerly creditors, own 170 shares.

34. The plaintiff and the intervening plaintiffs attack the specific transactions which Warren S. Keith conducted regarding the preferred stock formerly owned by outsiders. There are five such transactions with (a) Goodrich Oil Company, (b) Bay Oil Company, (c) Hon. Harry K. Stone, (d) Eastern Oil Company and (e) J. C. Keith. Plaintiff and the intervenors attack only the last three [Pl. Br. 12]. They also broadly contend that viewed as a whole the transactions were part of an improper scheme by which Warren S. Keith gained for himself the voting control of the corporation. Before considering the broader contention, this opinion reviews the separate transactions.

35. Goodrich Oil Company became dissatisfied in 1940 with its status as holder of 2,659 shares of the preferred stock. It sold those shares to Keith Towing Company and Keith Transportation Company in exchange for a towboat owned by the former and a barge owned by the latter. Although Keith Oil Corporation had been using those two facilities it had no legal title to, no equitable interest in and no lease upon either the towboat or the barge.

36. The shares of stock in Keith Towing Company and Keith Transportation Company happened to be owned equally by Mrs. Keith and her four sons. Neither Mrs. Ashley nor any other stockholder of Keith Oil Corporation owned any shares of stock in the Towing or Transportation companies. And neither the Towing nor the Transportation company was an agent, subsidiary or affiliate of Keith Oil Corporation.

37. Hence the Towing and Transportation companies became the outright owners of the 2,659 shares of preferred stock of Keith Oil Corporation. They were entitled to use those shares to pay their creditors and to distribute the balance in equal shares to Mrs. Keith and her four sons.

38. In fact, in 1940 the Towing and Transportation companies turned in, at just under $10 a share, 725 of these 2,659 shares to Keith Oil Corporation to pay that corporation their respective debts of $4,438.33 and $2,810.55. "As to this, plaintiffs make no complaint" [Pl. Br. 13]. Nor could they readily do so. The amended articles of association contemplated a prompt redemption at par of preferred stock. Although a price below par was permitted, and a delay until there were sufficient profits was allowed, there was no abuse, in the circumstances of this case, in acting more generously and promptly than the minimum stipulations of the amended articles. Nor could creditors complain that the redemption of the 725 shares was what is sometimes called an "unauthorized reduction" of capital. The reduction here was authorized. And the only ground of complaint which seems open—a complaint from another holder of preferred stock that he was not given notice, an opportunity to tender, and an equal opportunity to sell—is not presented to this Court inasmuch as plaintiff does not hold preferred stock and the intervening plaintiffs are not seeking to have their preferred shares redeemed.

39. At the same time in 1940 the Towing and Transportation companies turned in at par 284 preferred shares to Keith Oil Corporation for the purpose of crediting each of the four brothers with 71 shares or $710 against his drawings. The directors of Keith Oil Corporation took no action specifically approving of this surrender and credit. But since the four brothers and

their mother were then the four directors the transaction may have been approved informally in 1940. At any rate it was, in effect, informally approved by the board January 15, 1941, after the mother had ceased to be a director. For the directors' second vote of January 15, 1941, quoted in paragraph 31, showed that they approved in principle of surrenders of preferred stock by officers as an offset to drawings or borrowings. Indeed the only person who would seem to have a ground to complain of the disposition of these 284 shares is Mrs. Keith, who appears not to have received credit for her right to one-fifth of the shares. However, whatever may be her rights against her four sons or the Towing or Transportation companies those rights are not subject to vindication in this derivative suit by a stockholder of Keith Oil Corporation.

40. December 31, 1941, the Transportation and Towing companies turned in at par 1,650 preferred shares to Keith Oil Corporation for the purpose of crediting the four brothers and the mother with 330 shares each, or $3,300 each. Warren S. Keith, in accordance with the directors' vote of eleven months previously [see paragraph 31 above], used his $3,300 to reduce his overdrafts. The other three brothers and Mrs. Keith did not need their entire credits to meet their overdrafts. Accordingly, Keith Oil Corporation four months later, on April 30, 1942, re-issued or sold from its treasury at $10 per share to Howard 179 shares, to Richard 169 shares, to Robert 87 shares and to Mrs. Keith 163 shares. There is no showing that in these various transactions $10 a share was not a fair price.

41. As plaintiff recognizes [Pl. Br. 12], there is no basis in fact for finding any impropriety toward Keith Oil Corporation in the transactions conducted by Warren S. Keith with respect to the 2,659 shares of preferred stock of Keith Oil Corporation, formerly owned by Goodrich Oil Company.

42. Bay Oil Company became dissatisfied in 1941 with its status as holder of 1,487 shares of the preferred stock. In March, 1941, it agreed with Keith Oil Corporation to sell that corporation those shares for the equivalent of $14,897.25. The trivial sum of $27.95 above par for the whole lot represented so-called "interest" [Ex. 2, p. 8]. The $14,897.25 was to be made up of $7,527.95 cash and some storage tanks belonging to a corporation known as Keith Storage Company.

43. The evidence does not show who owned the stock in Keith Storage Company. It may have been owned equally by Mrs. Keith and her four sons. Here it is enough to say that there is no basis for a finding that Keith Oil Corporation owned stock in Keith Storage Company; or that the stockholders of the two companies were identical; or that one was the agent, subsidiary or affiliate of the other.

44. At first, Warren S. Keith seems to have treated the purchase of the 1,487 shares as an individual, personal transaction—he borrowing $7,527.95 from Keith Oil Corporation on open account and using the money to purchase the shares for himself from Bay Oil Company. However, before the year was out he made it clear by appropriate entries on the corporate books that the transaction was for the account of Keith Oil Corporation. He turned the 1,487 shares into the corporate treasury. Thereupon the corporation wiped out the $7,527.95 loan to Keith. Simultaneously the corporation took over the assets and assumed the liabilities of Keith Storage Company. The Keith Oil Corporation's regular accountant seems to have proceeded upon the basis that Keith Storage Company had no liabilities and that its only assets had been the storage tanks which had been transferred to Bay Oil Company as the equivalent of $7,370 toward the purchase price of the 1,487 preferred shares acquired by the treasury of Keith Oil Corporation. On that basis, he concluded that the stockholders of Keith Storage Corporation, whoever they may have been, made a contribution to Keith Oil Corporation of $7,370 paid-in surplus [Ex. 2, p. 8]. If this be the correct version, Keith Oil Corporation, its stockholders and creditors, have derived benefit and suffered no loss from the Bay Oil transaction.

45. Even if the situation was different from the way the accountant pictures it, there is no showing of damage. My suspicion, on the thinnest of evidence, is that the Keith Storage Company, when it was taken over, had no assets left except its right to some fraction of the 1,487 preferred shares which had been sold by Bay Oil in return for Storage's tanks and Keith Oil Corporation's cash. And that Keith Storage Company had no liabilities left except on a $2,000 note it had given to Dr. Foss for cash [R. 129, 136, 138]. If this be the correct story, or close to it, the transaction benefited Keith Oil Corporation. In any event, plaintiff concedes the corporation has no claim based on the Bay Oil transaction standing alone [Pl.Br. 12].

46. Hon. Harry K. Stone had been for many years before he became Probate Judge of the Commonwealth of Massachusetts a lawyer for Keith Oil Corporation and for the members of the Keith family. In return for his services he sometimes took payment in kind in the form of oil and gas. When the corporation was reorganized in 1938 he was a creditor for legal services rendered. In payment he accepted 1,958 shares of preferred stock which, had he chosen, he could have kept for his own account. But he never intended to use the stock for himself as he showed by not taking dividends upon it when they were declared in 1939 and 1940 [R. 125].

47. As the years passed he determined that he would give away the stock to the Keith family. But as a kind of return courtesy—hardly as an offset, because the amounts were so disparate—he expected the Keith family to give him his gasoline without charge from Keith Oil Corporation.

48. To give the stock, Judge Stone in 1942 voluntarily wrote, and handed his secretary, a memorandum stating that he regarded himself as holding the 1,958 shares of preferred stock for the benefit of the members of "the Keith family." So far as it is a question of fact, there is no doubt that this was intended to be a declaration of trust. And as to the settlor and the res there is no difficult legal problem. It is more difficult to decide who under the law of Massachusetts were the beneficiaries of this trust, and what was the extent of their interest. Not without some doubt, I find that the beneficiaries were intended to be the widow and children of Warren R. Keith as joint tenants, their interests, however, not being equal, but in proportion to the value of their holdings from time to time in other stock of Keith Oil Corporation; each joint tenant having the right at any time to demand a distribution on the basis of the then interests; in the absence of demand for distribution, the survivor to take all; and in the meantime Warren S. Keith as the eldest son and confidant of his father to have the voting power. This interpretation of the beneficial interests seems to me appropriate in the light of Judge Stone's deposition. And it prevents the failure of a trust for want of ascertainment of the beneficiaries.

49. In July 1942 Judge Stone delivered certificates for the 1,958 shares to Warren S. Keith. His intent was to transfer to Warren S. Keith the legal title to these shares, but to leave the beneficial interests as described in the preceding paragraph. He told the Keiths he expected the Keith family to pay his past and future gasoline bills. In accepting the benefits of the trust a beneficiary would necessarily be accepting its burdens.

50. Judge Stone did not intend to make a gift to Warren S. Keith personally. Keith has no basis to claim that he was a donee of the entire equitable interest. Nor has he any basis to claim that in some other way he acquired the equitable title. He never gave any consideration for the shares. So he is not a purchaser for value. And he showed by his subsequent conduct [Ex. A; R. 59-60] that when he took the shares he was fully aware that he was taking them as trustee for others as well as himself.

51. Nonetheless, Warren S. Keith acted as though the shares were intended to be his own personal property, subject however to an inchoate moral duty on his part to extinguish Judge Stone's liability to the corporation for such gasoline as the judge might have ordered in the past or might order in the future.

52. Accordingly in December, 1944, Warren S. Keith transferred to Keith Oil Corporation 1,147 of the Stone preferred

shares at par in consideration of the corporation cancelling Judge Stone's debt of $1,100 for gasoline and reducing Keith's indebtedness by $10,370. Keith kept for himself the remaining 811 shares.

53. Keith Oil Corporation and its stockholders as such were not adversely affected by this transaction. They were not beneficiaries of the Stone trust. They had and have no standing to complain of its breach. And while they have standing to raise three questions, first, whether Keith Oil Corporation had authorized redemption of these shares, second, whether the redemption price was fair, and third, whether the corporation received the shares free of any outstanding equity, those questions are not in fact raised and if they were could be answered. The first two are fully answered by the terms of the amended articles of association which expressly contemplate redemption of preferred stock at par. (Moreover, the use of the 1,037 shares to reduce Warren S. Keith's personal indebtedness was authorized by the second directors' vote of January 15, 1941 [Par. 31, above].) The third question is answered by the fifth sentence of paragraph 81 and by paragraph 82 below.

54. About October 11, 1943, Warren S. Keith borrowed $5,500 from a finance company, the Lexington Corporation. At the time he had unpaid obligations on open account to Keith Oil Corporation which were in the neighborhood of $8,000. He used the $5,500 to buy for his own account 589 shares of preferred stock of Keith Oil Corporation for $2,500 from Eastern Oil Company, and 635 similar shares for $3,000 from his cousin, J. C. Keith. Between 1943 and 1946 Warren S. Keith repaid his debt of $5,500 to Lexington [R. 68]. But in making this repayment he did not use either his private funds or his savings from his salary [R. 70]. Instead, without special authority from the directors he borrowed the necessary funds from Keith Oil Corporation without agreeing to pay or paying interest thereon [R. 71, 72].

55. The inescapable inference is that if Warren S. Keith had not been overdrawing his account, Keith Oil Corporation would have had, and would have used, $5,500 to purchase its own preferred shares from Eastern Oil Company and J. C. Keith.

56. Another fair inference is that in the long run Warren S. Keith was using funds which he borrowed from Keith Oil Corporation without interest to buy for $5,500 these blocks of 589 and 635 shares. To be sure in form the $5,500 came initially from Lexington, a finance company. And no doubt Warren S. Keith had to pay a steep rate of interest for the $5,500. But ultimately he could not repay the principal out of his own savings and resources. He had to get the funds for repayment by borrowing without interest from Keith Oil Corporation. Thus in substance the corporation's money was used by Warren S. Keith to buy these two lots of stock.

57. In view of the unwarranted use of the corporation's funds [see par. 32 above], and in view of the fact that Keith's own conduct had disabled the corporation from purchasing these two lots for its own account [see par. 55 above], the corporation is entitled to regard the two transactions as undertaken by Warren S. Keith for its account. Upon payment to Warren S. Keith of $5,500, Keith Oil Corporation was entitled to the two lots of 589 and 635 shares.

58. Having finished an examination of the separate acquisitions of preferred stock, I must turn to the broad indictment that Warren S. Keith used his position and the funds of the corporation to gain for himself control of a majority of the preferred stock and thus to gain control of the corporation at the expense of the common stockholders, especially of his brothers and his mother.

59. There is no direct evidence that he intended such a result. Moreover, he did not impress me as being a man who would design or effectuate such a scheme. And what he did was not calculated to accomplish such a purpose. When he acquired the Goodrich, the Bay Oil and the Stone stock he turned all or part of it in. Then he re-issued some of the Goodrich stock to his brothers and mother. This was hardly the action of a man who was trying to exclude his family from control of stock. Of,

course, he did resort to some practices in acquiring stock which were entirely improper. One example is his purchase for his own instead of the corporate account of the blocks of Eastern Oil and J. C. Keith stock. But at the time of that purchase—due to his own previous improvidence rather than a subtle evil purpose—the corporation had inadequate cash in the till, and probably he could borrow from a finance company more advantageously on his personal note rather than on a corporate note.

60. On the whole, I find that Warren S. Keith had no over-all scheme to purchase for his own account preferred stock in order to get control of the enterprise and keep the common stockholders out of control. He was merely seeking to stave off impatient preferred stockholders who were demanding dividends and redemption. And he was neither ingenious, nor resourceful, nor very sensible in the expedients to which he resorted in order to keep the business from making a second trip to the bankruptcy court for further reorganization.

### E. Miscellaneous Transactions.

61. Many years ago, perhaps before Keith Oil Corporation was organized, the plaintiff's father, Warren R. Keith, was the owner of real property at 49 North Main Street, Brockton. He mortgaged it to his first cousin, J. C. Keith, to secure a note of Warren R. Keith, the father, for $2,000 [R. 104, 105]. The father transferred the property to the corporation, which at least informally assumed the mortgage and occasionally paid interest [R. 105, 118]. However, J. C. Keith, the mortgagee, apparently did not always get the interest and the amortization when it was due. So he was allowed to run up accounts for gasoline that he wanted for personal use [R. 118]. By the fall of 1945 these accounts due from J. C. Keith amounted to $2,886.86 and $397.95 upon the corporate books. The books failed to show anything of the mortgage debt assumed by the corporation. In 1940 the City of Brockton took the property for non-payment of taxes. In 1945 the corporation discharged these two debts upon J. C. Keith's informal release of the corporation from liability for mortgage interest, amortization and principal.

62. Keith Storage Company borrowed $2,000 from Dr. M. W. Foss on a note. As explained in paragraph 45 above the Keith Oil Corporation probably assumed that liability in 1941. The corporation did nothing about paying in cash the debt or interest. Instead it allowed Dr. Foss to charge his oil and gas which he bought from the corporation. By the fall of 1945, the charges amounted to $2,271.61. In 1945 the corporation discharged this debt upon Dr. Foss' informal release of the corporation from liability for interest and principal on the $2,000 note.

63. January 6, 1943, the corporation in order to re-finance a previous mortgage to another company mortgaged a large part of its tangible assets and substantially all its accounts receivable to White Fuel Corporation [Pl. Ex. 8, R. 108, 109, 149]. This mortgage debt now amounts to $28,000. An additional mortgage was placed with the same company on September 25, 1946 [Pl. Ex. 9]. Reference to these mortgages is not pellucid in the balance sheet for December 31, 1946.

64. Warren S. Keith incurred certain personal obligations which he paid by drawing funds from the corporation and charging the amounts to those who had been his creditors. Examples of the situation as it was in the fall of 1945 are: Andrews Electric Co., $95.31; T. F. Crowell & Sons, $555.99; L. Richmond & Co., $345.47; and Willis Furniture Co., $264.80.

### F. The 1945 Litigation and Settlement.

65. September 4, 1945, Richard H. Keith and Howard C. Keith brought in the Superior Court for the Commonwealth of Massachusetts a derivative stockholders' suit against Keith Oil Corporation and Warren S. Keith personally. This was the usual type of class suit. The pleadings alleged substantially the same wrongs relied upon by plaintiff in this case.

66. After a master had been appointed and testimony had been taken, the named parties agreed to settle. There was no attempt to notify all stockholders or even the judge of the terms of the proposed settlement.

67. The principal provisions of the settlement were: (a) Warren S. Keith was to

turn in to the corporate treasury the 1,958 Stone shares, the 589 Eastern Oil shares and the 635 J. C. Keith shares, (b) "In consideration thereof the full indebtedness of said Warren S. Keith to the Corporation, for advancements and over-payments to him, up to and including Sept. 30, 1945, which, without previous credits, is estimated at $19,832.64 is canceled. The balance due from Richard Keith, $902.76 is canceled. The balance due from Howard Keith, $261.03 is canceled. The balance due from Robert Keith, $229.95 is canceled. So that, as of September 30, 1945, Warren S. Keith owes the Corporation no money except for other shares held by him." (c) "Elizabeth St. John Keith is to turn into the Corporation as treasury stock 629 shares of preferred stock and is to be credited $6,-295.68 on her merchandise account." (d) Warren S. Keith's salary for 1945 and for the balance of his term of office was fixed at $5,000; (e) Howard Keith was "to be employed by the Corporation at a weekly salary of $75, until further notice"; (f) "the Corporation" was to pay its lawyers $1200 and plaintiffs' lawyers $1200; and (g) "No officer of the Corporation is to be permitted to borrow money from the Corporation."

68. In this settlement agreement these are significant points. (a) Most of the provisions [such as those recited in Par. 67 (a), (b), (c) and (d)] by inference, and others [such as those recited in Par. 67, (e) and (f)] by explicit language purport to bind the corporation. (b) The interrelated sentences which are set forth in paragraph 67(b) recite that the consideration covered the cancelation of the debts of all four sons. (c) The agreement purported to discharge Warren S. Keith from all his indebtedness to the corporation—not specific items. The figure of $19,832.64 purports to be only an estimate. And neither then nor at the trial was there submitted a break-down of that figure which is an entirely satisfactory explanation.

69. In form, the agreement was executed by Mrs. Keith and her four sons—Warren S. Keith signing personally without explicit reference to his official capacity. However, on November 6, 1945, the agreement was approved at a regular meeting by the corporation's directors who then were Warren S. Keith, Richard H. Keith (one of the intervening plaintiffs here) and Walter McDonald, a lawyer not shown to be under any one's domination. The agreement was then carried out. So far as it is a question of fact, I find that in view of this ratification and in view of the terms of the agreement which explicitly or by inference purport to bind the corporation, the agreement was made and consummated between Mrs. Keith, her four sons and Keith Oil Corporation.

70. November 14, 1945, by agreement of those who were plaintiffs in the state court litigation, that court entered a decree of dismissal apparently without prejudice.

71. Since Mrs. Ashley, plaintiff in this case, was not a party to the 1945 settlement agreement and since those preferred stockholders who were not relatives of the Keiths were not parties to, or even notified of, the 1945 settlement agreement, it is pertinent to examine the fairness of that agreement to Keith Oil Corporation. In this examination it is necessary to review what the corporation's maximum financial claims were against Warren S. Keith and against his mother and brothers and to compare in dollars and cents those claims with what the corporation received in the settlement. It is indeed necessary to include even those claims which were not specifically in the minds of negotiators, for the agreement discharged all corporate claims against Warren S. Keith.

72. Before considering the claims against the Keiths, I lay aside certain transactions on the ground that Keith Oil Corporation as such could not use them as a basis of tenable financial claims against any member of the Keith family. These irrelevant matters are—(a) the Goodrich Oil transaction which caused the corporation no loss [Par. 41, above]; (b) the Bay Oil transaction which likewise caused the corporation no loss [Par. 45, above]; (c) the Stone transaction which involved personal stock of the Keith family and which likewise caused the corporation no loss [Par. 53, above]; (d) the 1941 and 1945 payments by the corporation of $17.50 to Crane

Co., $147.25 to Eastern Oil Co., $166.25 to Mrs. Keith and $24 to a fourth party—all of these amounts having been paid out of profits to preferred stockholders who were entitled to the money in accordance with the amended articles of association [Par. 14, 13 and 11(a), above]; (e) the corporation's discharge in 1945 of J. C. Keith's debts of $2,886.86 and $397.95 which were less than the corporation probably owed him for interest, amortization and principal on a mortgage it had assumed [Par. 61, above]; and (f) the corporation's discharge in 1945 of Dr. M. Foss' debt of $2,271.61 which was less than the corporation probably owed him for interest and principal on a note it had assumed [Par. 62, above].

72x. Also before considering the accounting, I assume that the corporation would have exercised (as it did exercise) its option to purchase from Warren S. Keith for $5,500 the 589 shares of preferred stock acquired by him from Eastern Oil and the 635 similar shares acquired from J. C. Keith [Par. 57, above].

73. Against Warren S. Keith the corporation before the settlement could have listed these as corporate financial claims—

| | |
|---|---:|
| (a) Open account as of Sept. 30, 1945 | $ 6,121.81 |
| (b) Items chargeable to W. S. Keith on account of Andrews Electric Co., T. F. Crowell & Sons, L. Richmond & Co. and Willis Furniture Co. | 1,261.57 |
| (c) Excess salary for the year 1944 | 2,000.00 |
| (d) Estimated interest upon the excess salary and upon the loans on open account from 1938 through 1945 | 2,000.00 |
| | $11,383.38 |

In fact, those who made the settlement are not shown to have had in mind items (c) and (d) above.

74. Against the brothers, Howard, Richard and Robert, the corporation could have listed as corporate claims the amount of their open accounts as of September 30, 1945, together with interest upon the loans on open account from 1938 through 1945. The amounts of the 1945 open accounts were: Howard, $261.03; Richard, $902.76 and Robert, $229.95. The estimated interest upon loans in the past would be in the neighborhood of $500.

75. Against the mother, four sons and daughter the corporation could have listed as a claim the $290.89 which stood as a charge to Judge Stone for gasoline and which the Keiths as a group had assumed when they accepted the equitable interest in the 1,958 shares formerly owned by Judge Stone [Par. 49, above].

76. When the settlement was carried out what happened was this: (a) First, the corporation reversed the transactions described in paragraph 52, above. This increased the corporation's possible claim against Warren S. Keith's debt from the maximum figure of $11,383.38 [Par. 73, above] to $22,853.38 (an amount which incidentally includes Judge Stone's $1,100 debt, which is more properly attributable to the beneficiaries of the Stone trust); and at the same time increased his stock holdings by 1,147 preferred shares. (b) Second, he turned in to the corporation these 1,147 shares together with the other 811 shares he had acquired from Judge Stone. [Par. 52, above]. This gave to the "Keith family" as beneficiaries of the Stone trust [Par. 48, above] a total credit against the corporation of 1,958 shares or the equivalent of at least $19,580. This valuation is based on the corporate balance sheet and on the provisions of the amended articles of association that each share of preferred should be redeemed at $10 par plus dividends. In all probability, on account of the accrued accumulative dividends, the stock was worth $13 a share. (c) Third, Warren S. Keith turned in the 589 shares he had acquired from Eastern Oil and the 635 shares he had acquired from J. C. Keith. This gave him a personal credit of $5,500. [Par. 72x, above]. (d) Fourth, Mrs. Keith turned in 629 shares which gave her a credit for at least $6,290; and for that action her merchandise account was credited with a sum of $6,295.68.

77. From the facts just stated it appears that the corporation received as benefits (aside from the blocks of 589 shares and 635 shares to which it had an equitable claim) two blocks of stock worth at least $19,580 and $6,290 or a total of $25,870. For this stock it discharged these debts: All of Warren S. Keith's debt which had been reduced from $22,853.38 to $17,353.38 [Par. 76(a) and (c), above]; the principal of and the interest upon all of the debts of the brothers, Howard, Richard and Robert, amounting to $1,893.74 [Par. 74, above]; $6,295.68 of Mrs. Keith's merchandise debt and interest thereon, if any, [Par. 76, above]; and Judge Stone's debt of $290.89 and interest thereon, if any.

78. Put concisely, the settlement gave the corporation stock worth at least $25,870 to discharge claims worth at most $17,353.-38, $1,893.74, $6,295.68 and $290.98 or a total of $25,833.78. If I were to consider the question as an original one for my unfettered decision, I should find that the settlement was from the point of view of the corporation fair and reasonable, if not overgenerous. And I have no doubt that, considering the question as a judge asked to set aside a settlement which has been already approved by a board of directors on which a neutral held the balance of power, I must find that there was a reasonable basis for the directors' judgment that the corporation should accept the settlement.

79. I am not unmindful that in stating the facts surrounding the 1945 settlement I have omitted facts with respect to (a) the lawyers' fees of $2,400; (b) the claim of the three younger brothers and the mother that they did not know from what liabilities Warren S. Keith was being released and what his future schemes were; and (c) the claim of Mrs. Ashley that she did not consent to the use which was made of her fraction of the stock held in the Stone trust. I shall now consider those three points summarily.

80. The counsel fees apparently covered the charges both of lawyers for the company and for the then plaintiffs. The company plainly had a right to pay its own lawyer a reasonable fee. It also had a right to pay the then plaintiffs' lawyers' a fee out of the $25,870 stock that the corporation recovered through their efforts. Shaw v. Harding, 306 Mass. 441, 450, 28 N.E.2d 469; Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. ——, 67 S.Ct. 828; Bailey v. McLellan, 1 Cir., 159 F.2d 1014, 1016. And the amount for all counsel being less than 10 per cent of the recovery was reasonable. See cases cited in Hornstein, New Aspects of Stockholders' Derivative Suits, 47 Columbia L.Rev. 1, 15-17, 26, 27.

81. I am not persuaded that in 1945 the three younger brothers and their mother were unaware of Warren S. Keith's potential liabilities and his future plans, so far as he had any. The sons had been officers of the corporation. They had access to its books. They knew the family history. They assented for their own reasons to the use to which the Stone trust was put. And they had competent counsel to aid them. Mrs. Keith is a more doubtful case. But she did not testify in either this or the earlier case. The references to her in the testimony are not clear cut. And I am not prepared to say that she was, or that she regards herself as having been, in any way deceived or overreached by her eldest son. Furthermore, the intervening plaintiffs have come in to the case only as representatives of a class of common stockholders asserting any claims that Keith Oil Corporation has against Warren S. Keith. They have no right to be heard on any claims that they have personally against him.

82. As to Mrs. Ashley's claim that she did not assent to the use of her share of the Stone trust there are three answers: First, I find after the 1945 settlement she learned of the use which had been made of her interest in the Stone stock and by her silence acquiesced in the disposition of it which had been made by her mother, her three younger brothers and by Warren S. Keith [R. 8-9]. Second, I find that under the terms of the trust [Par. 48 above] her beneficial interest was negligible, probably less than $100. Third, this particular claim of Mrs. Ashley is a personal not a corporate claim, and it is not justiciable in this proceeding.

### G. Events Since the 1945 Settlement.

83. Since the settlement agreement of November, 1945, Warren S. Keith has not engaged in affirmative misconduct so far as appears. On the other hand, he does not appear to have sought to have the corporation pay dividends upon or redeem preferred stock [Pl.Exs. 10D and 10E]. Nor does it appear that any preferred stockholder has requested redemption.

84. The corporation's latest balance sheet was taken as of December 31, 1946. It showed total assets of $102,648.55. Of that amount the principal items were: land, $25,000; building and equipment, after depreciation, $30,094.16; trade accounts receivable, $32,785.47; merchandise inventory, $9,410.18; and accounts receivable from members of the Keith family, $3,092.29 (of which only $46.40 was due from Warren S. Keith).

85. The liabilities shown aside from capital liabilities were: current liabilities of $51,341.54 (of which the largest was accounts payable, $44,101.27); and mortgage of $431.91. No reference is made to the White Fuel Co. mortgages unless, as I believe, it is embodied in "current liabilities."

86. The balance sheet shows liability at par for preferred stock outstanding as $16,640. It does not, of course, show the earned but undeclared and unpaid cumulative dividends on that stock which were then $3.50 and are now $3.75 per share. On 1,664 shares an unpaid dividend of $3.50 would amount to $5,824. From that $5,824 should be subtracted the $331 and $24 dividends heretofore paid in 1941 and 1945 [Par. 14, above].

87. According to the balance sheet, adjusted by the items considered in the previous paragraph, the common stock had on December 31, 1946, a value of $28,766.10 or $35.20 a share.

88. Probably the real value of a share of common stock today as set by a willing buyer and a willing seller is only a small fraction of that amount, if anything.

89. Before bringing this action plaintiff requested the corporation to claim from Warren S. Keith an accounting of his conduct and payment of suitable reparation.

Being under the control of directors who were favorable to Warren S. Keith and who were persuaded of the propriety of his conduct, the corporation refused to act.

90. During the trial of this case on April 30, 1947, the Court urged the individual defendant, Warren S. Keith, the plaintiff, Lillian K. Ashley, and the other members of the Keith family who have since intervened as plaintiffs to try to settle their difficulties out of court (R. 91-98). The Court suggested that either the plaintiff and intervening plaintiffs should buy the stock of the individual defendant or that the individual defendant should buy the stock of the plaintiff and the intervening plaintiffs, the sale being made to whichever would be prepared to pay the higher number of dollars per share of stock. All parties seemed inclined at first to try to solve their differences in the manner proposed by the Court. However, after careful consideration, all parties rejected this proposed solution of their dilemma and other types of compromise advanced by their respective counsel. These abortive negotiations persuade me that the difficulties between the various factions owning stock in Keith Oil Corporation have deep emotional and family, as well as rational and corporate, roots.

### H. Remaining Conclusions of Law.

91. The principal remaining questions of law which this case presents are these: (a) has this Court federal jurisdiction under the diversity jurisdiction clause of 28 U.S.C.A. § 41(1); (b) if so, has this Court power to appoint a receiver under the circumstances of this case and (c) if so, should this Court exercise the power.

92. If the question of federal jurisdiction were an open one, I should rule that there had not been compliance with the essentials set forth in United States Constitution, Article III, Section 2 and 36 Stat. 1091, 28 U.S.C.A. § 41(1). Disregarding the form of the pleadings in this case, I should conclude that the parties should be realigned according to their real interest. That is, I should treat this as a suit by a Massachusetts corporation against a Massachusetts officer. 2 Moore's Federal Practice, 2272, 2273. Resort to such realign-

ment is admittedly necessary and proper to determine whether in the case at bar there is involved the $3,000 which is a prerequisite to the exercise of diversity jurisdiction. Koster v. (American) Lumbermens Mutual Cas. Co., 330 U.S. 518, 67 S.Ct. 828; Moore, supra, 2296. Resort to such realignment seems the only logically consistent course to determine whether in the case at bar there is involved the necessary diversity of citizenship. In addition to such logical considerations, I should have thought weight ought to be given to the fact that "the dominant note in the successive enactments of Congress relating to diversity jurisdiction is one of jealous restriction, of avoiding offense to state sensitiveness, and of relieving the federal courts of the overwhelming burden of 'business that instrinsically belongs to the state courts' in order to keep them free for their distinctive federal business." City of Indianapolis v. Chase National Bank, 314 U.S. 63, 76, 62 S.Ct. 15, 20, 86 L.Ed. 47.

93. But I am not a free agent. In 1905 the Supreme Court in Doctor v. Harrington, 196 U.S. 579, 25 S.Ct. 355, 49 L.Ed. 606, held that the realignment which I would have thought proper is inapplicable where the corporation is in antagonistic hands. And only a few months ago, the Supreme Court of the United States repeated the same doctrine to sustain federal jurisdiction in Koster v. (American) Lumbermens Mutual Casualty Co., 330 U.S. 518, 67 S.Ct. 828. That was a derivative suit brought by a New York policy holder having less than a $250 stake in an Illinois mutual insurance company. He complained that an Illinois officer of that company had defrauded the Illinois corporation. All the justices of the Supreme Court in their majority and minority opinions seem to have concluded that diversity of citizenship existed. And, bowing to their judgment, I conclude that diversity of citizenship exists in the case at bar.

94. Since the case is before me only because of the diversity of citizenship of the parties, I am plainly required to turn to Massachusetts state law to determine whether plaintiff has a cause of action against Warren S. Keith.

95. To show that she has a cause of action plaintiff points both to what she regards as specific diversions of the assets of Keith Oil Corporation by Warren S. Keith and to general mismanagement of the corporation by him.

96. Many of the charges of specific diversions are not supported by the evidence. The transactions in the Goodrich Oil, Bay Oil and Stone stock were not an injury to Keith Oil Corporation. From the corporation's viewpoint the only substantial issues were whether in those three cases the corporation should have redeemed the stock and if so was the price fair. The right, indeed the duty, to redeem preferred stock at $10 a share is set forth in the amended articles of association. For a corporation to redeem its preferred stock at par when a lower price might fetch the shares is perhaps not usually sound business. But in the present case it is appropriate to remember that the preferred stock was issued to creditors at the time of a reorganization—each share of $10 par preferred stock being issued for a $10 debt. Indeed, as plaintiff's own brief puts it the preferred shares were regarded by all as "roughly equivalent to income bonds" [Pl.Br. 6].

97. Of course, preferred stockholders who were not given the chance to redeem in accordance with the mechanism set forth in the amended articles of association might have had a ground to complain, especially if they had shown their willingness to sell their shares at a discount. But the original plaintiff, being only a common stockholder, framed no such issue in her pleadings. And the evidence shows nothing to support the view that this complaint is pressed by any one before the Court.

98. Other charges of specific diversion, however, are supported by the evidence. Under Massachusetts law it was a breach of his fiduciary duty as president, treasurer and director of Keith Oil Corporation for Warren S. Keith (a) to draw from the corporation in 1944 a salary of $5,000 when only $3,000 had been authorized by the directors, (b) to borrow and to allow members of his family, none of whom is shown to have had a high financial credit

rating, to borrow from the corporation large sums of money for long periods of time without paying interest thereon, and (c) in effect, to use corporate money to purchase for his own account the preferred shares formerly owned by Eastern Oil Company and by J. C. Keith. Lydia E. Pinkham Medicine Co. v. Gove, 303 Mass. 1, 20 N.E.2d 482; Albert E. Touchet Inc., v. Touchet, 264 Mass. 499, 163 N.E. 184. The principles underlying this conclusion are so self-evident as to require no discussion except for one point. In holding Warren S. Keith guilty of a breach of duty in purchasing the Eastern Oil and J. C. Keith stock, I do so on the narrow ground that he bought the stock with corporate funds after having previously disabled the corporation from capacity to make the purchase [Par. 55-57, above]. I do not reach the question whether under Massachusetts law an officer or director of a corporation is entitled to use his official knowledge to buy for his own account and profit stock offered to the corporation at a bargain.

99. The conclusion that Warren S. Keith was once guilty of diversions does not, however, by itself justify the corporation in now securing judgment against him, for in the meantime the corporation and he have executed and performed a settlement agreement. I have found that an independent board of directors could have regarded and did regard this as a fair and reasonable contract. To avoid any confusion, I underline the point that the reason that a money judgment cannot be recovered against Warren S. Keith is because, after scrutiny, this Court finds that the directors were warranted in making the agreement of settlement. That is, my conclusion rests on the power of directors to make a reasonable contract.

100. My conclusion does not rest on estoppel by judgment or any similar doctrine growing out of the state court proceedings. For one thing, the state court's decree dismissed the bill before it apparently without prejudice and without approving the settlement. Second, the proceedings in the state court could not bind by estoppel the many stockholders who were not notified of the proposed settlement and decree. Perhaps the Massachusetts rule, like Rule 23(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, requires that notice of a proposed corporate settlement of a stockholder's derivative suit be given to all stockholders of the same class. Whether that be so or not, if such notice is not acquired by all who were stockholders at the time of the wrong complained of [cf. Hennessey v. Nelen, 299 Mass. 569, 13 N.E. 2d 431], the settlement does not operate as an automatic estoppel by judgment against an affected stockholder who did not know of nor participate in the proceedings. Beaudette v. Graham, 267 Mass. 7, 165 N.E. 671. See McLaughlin, Capacity of Plaintiff Stockholder to Terminate A Stockholder's Suit, 46 Yale L.J. 421, 432; Hornstein, Problems of Procedure In Stockholders' Derivative Suits, 42 Columbia L.Rev. 574, 583; Hornstein, New Aspects Of Stockholders' Derivative Suits, 47 Columbia L. Rev. 1, 21.

101. While Warren S. Keith's financial liability for his previous specific diversions of corporate assets has been extinguished by the accord and settlement of November, 1945, the question remains whether in view of his past conduct of the business and other factors this Court has power to and should appoint a receiver.

102. Plaintiff's counsel in approaching this issue urges me to look upon the case as one in which a receiver would be necessary only for a short period of time until all the preferred stock is retired. I do not regard that as a realistic view. If Keith Oil Corporation is once more placed in custodia legis I do not expect it to emerge as a solvent going concern. Its balance sheet shows, it is true, that the common stock has a value of $35.20 a share. But I believe it is in fact much less, if anything. Moreover, the principal assets of the company are mortgaged. Creditors who are not shown to be impatient now might become so. A competent outside receiver could hardly be procured to give his full time to the business for the $6,000 annually which Warren S. Keith now receives. Finally, there is no reason to believe that

the situation of which the plaintiff complains will be entirely remedied once the preferred stockholders are out of the picture. Once they have left, the two big blocks out of the 820 shares of common stock will be in the hands of Warren S. Keith with 319 shares and Mrs. Keith, his mother, with 421 shares. I have no reason to assume that when it comes to a show down Mrs. Keith will vote against her eldest son. While she is against him at the moment, she usually has not been. And she did not come to Court to testify in this suit. Indeed when the preferred stock is redeemed she may not be alive, and her stock may be in other hands.

103. In the light of all these considerations I have concluded that there is a substantial chance that any receiver whom I appoint will have to liquidate the corporation. And it is in the light of that possibility that I ought to consider whether I have power to appoint a receiver.

 104. In suits against a corporation brought to a federal court by a stockholder or creditor on the basis of the diversity jurisdiction clause, the question whether a court had power to appoint a receiver was prior to Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, determined by reference solely to principles of federal law. See, for example, In re Metropolitan Railway Receivership, 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403; Harkin v. Brundage, 276 U.S. 36, 48 S.Ct. 268, 72 L.Ed. 457; First National Bank of Cincinnati v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391; Tower Hill-Connellsville Coke Co. v. Piedmont Coal Co., 4 Cir., 64 F.2d 817, 825-827, 91 A.L.R. 648; See Hornstein, A Remedy For Corporation Abuse—Judicial Power To Wind Up A Corporation At The Suit Of A Minority Stockholder, 40 Columbia L.Rev. 220, 240. The same course has been occasionally followed since the Erie case. Securities and Exchange Commission v. Aldred Investment Trust, D.C.Mass., 58 F.Supp. 724, affirmed 1 Cir., 151 F.2d 254; s. c. sub. nom. Bailey v. Proctor, 1 Cir., 160 F.2d 78, 83, 84. See 60 Harv.L.Rev. 816-818. But it seems to me clear from the construction put upon Pusey & Jones Co. v. Hanssen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763, by footnote 3 of Guaranty Trust Co. v. York, 326 U.S. 99, 106, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231, that the question whether a stockholder or creditor of a corporation has a *substantive* right to have a receiver appointed in a suit founded on the diversity jurisdiction clause is to be determined by reference to state law. But see Kelleam v. Maryland Casualty Co., 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899.

 105. Under Massachusetts state law an equity court has the power to appoint a temporary receiver for the conservation of assets. Richardson v. Clinton Wall Trunk Mfg. Co., 181 Mass. 580–582, 583, 64 N.E. 400. Compare Olds v. City Trust, etc., Co., 185 Mass. 500, 505-506, 70 N.E. 1022, 102 Am.St.Rep. 356; Folger v. Columbian Ins. Co., 99 Mass. 267, 274-276, 96 Am.Dec. 747. So far the rule is the same as the federal courts would apply in cases of general jurisprudence not founded on state law. Burnrite Coal Briquette Co. v. Riggs, 274 U.S. 208, 210, 47 S.Ct. 578, 71 L.Ed. 1002.

 106. But it is more doubtful whether the Massachusetts state rule like the federal rule laid down in Bailey v. Proctor, above, permits the appointment of a receiver who may be required not merely to conserve the property but ultimately to liquidate it. Yet after careful consideration, I have come to the conclusion that the Massachusetts court would in an appropriate case exercise the power to appoint a receiver of a corporation even though it seemed probable that the receiver would in the end have to liquidate the enterprise. This conclusion requires elaboration.

107. I concede that the older Massachusetts cases laid down the rule that in the absence of statute a stockholder was not entitled to the appointment of a receiver for the purpose of liquidating the corporation. Richardson v. Clinton Wall Trunk Mfg. Co., 181 Mass. 580, 582-583, 64 N.E. 400. Compare Olds v. City Trust, etc., Co., 185 Mass. 500, 505-506, 70 N.E. 1022, 102 Am. St.Rep. 356; Folger v. Columbian Ins. Co., 99 Mass. 267, 274-276, 96 Am.Dec. 747.

And this was particularly true where, as in some of the cases just cited, the corporation in question was foreign to the Commonwealth. See Richardson v. Clinton Wall Trunk Mfg. Co., supra. The reason given was that the legislature having created the corporation, it was the only body that could authorize its dissolution or a proceeding tantamount to dissolution.

108. But in estimating the worth of these older authorities the first point to recall is that it was not until c. 178 of the Act of 1877, compiled now in G.L.(Ter. Ed.) c. 214, § 1 et seq., that the Massachusetts legislature gave the courts of the Commonwealth general equity jurisdiction. Hence there was at the outset a reluctance for a Massachusetts equity court to develop the full implications of what other courts and leading jurists regarded as ordinary equitable principles. Compare R. Pound, Visitatorial Jurisdiction Over Corporations In Equity, 49 Harv.L.Rev. 369, 373.

109. The second point is that when these older cases were decided the judiciary was not so familiar as it later became with the principle of so-called friendly receiverships which were common in the federal courts from the time of In re Metropolitan Railway Receivership, 1908, 208 U.S. 90, 96, 111, 28 S.Ct. 219, 52 L.Ed. 403 [see Note 47 Harv.L.Rev. 828], until the passage of § 77B of the Bankruptcy Act, later revised as Chapter X of the Chandler Act, 11 U.S.C.A. Chapter 10, and which have been paralleled in the Massachusetts state courts in the last two decades. New England Theatres, Inc., v. Olympia Theatres, Inc., 1934, 287 Mass. 485, 492, 493, 192 N. E. 93. These friendly receiverships (begun at the suit of a simple contract creditor seeking to preserve for equitable distribution the assets of a corporation alleged to be solvent in the bankruptcy sense but insolvent in the equity sense) accustomed the Massachusetts as well as the federal courts to the judicial power to order corporate liquidations under purely equitable non-statutory principles. These cases of friendly receiverships overrode the arguments that such liquidations were in effect dissolutions [see Note 44 Harv.L.Rev. 437, 440]; that they interfered with the exclus-ive right of the legislature to prescribe the terms of birth, of continued existence and of death of corporations; that they, in effect, cut off the source of some anticipated state revenue from franchise and like corporate taxes [see Note 44 Harv.L.Rev. 437, 440, note 19]; that while, as a matter of legal theory, they did not shorten the period of time in which corporate creditors would ordinarily have been entitled to present claims if the corporation instead of being in receivership were being dissolved under statutory procedure like Mass.G.L.(Ter. Ed.) c. 155, § 51 [Compare Folger v. Columbian Insurance Co., 99 Mass. 267, 96 Am.Dec. 747] they, as a matter of actual practice, usually left the corporation without assets to respond to a judgment; and that they involved the courts in an undesirable supervision and administration of the business affairs of a corporation.

110. The third point is that in recent years equity judges have come to a clearer realization of the modern relationships between corporate businesses and state legislatures. They have seen that business corporations are now commonly organized under general rather than special laws—and that in that situation it is academic to suppose that the legislature would be so mindful and so periodically informed of the financial and managerial situation of each corporation as to initiate steps for the dissolution of each corporation when dissolution became appropriate. The courts also observed that the modern state Attorney-General has been so preoccupied with other affairs of state that he would be unlikely to take steps available to him to visit and, in appropriate cases, wind up business corporations. Thus the courts have seen that where a corporation was being mismanaged the real choices open were to allow the situation to continue, to intervene, or to await the creation by the legislature of administrative machinery—such as a state corporation commission or a federal securities commission. Rather than sit idle or abandon more territory to what some regarded as an undesirable increase of bureaucracy [see R. Pound, supra, 49 Harv. L.Rev. at p. 395], the equity courts took the second of the three choices. They ex-

panded their concept of their powers to liquidate corporations at the suit of shareholders. Compare Black, J., in the Koster case citing Laswell, Doan and Podell, A Non-Bureaucratic Alternative To Minority Stockholders' Suits, 43 Col.L.Rev. 1036, 1045, 1047; Koessler, The Stockholders Suit: A Comparative View, 46 Col.L.Rev. 238, 241.

111. This new trend which began in Michigan in Miner v. Belle Isle Ice Co., 1892, 93 Mich. 97, 53 N.W. 218, 17 L.R.A. 412, has not yet been explicitly approved in the Massachusetts state courts. But I am persuaded that if squarely faced with the issue the highest court of the Commonwealth would now say that there is general equity jurisdiction to appoint a receiver, and to direct a corporate liquidation upon the application of a minority stockholder upon a showing that the officers, directors and shareholders in control had been fraudulently dissipating or mismanaging the corporate assets. This seems to me the fair inference from Field, C. J.'s dicta in Hurley v. Boston Railroad Holding Co., 1944, 315 Mass. 591, 616, 617, 54 N.E.2d 183 and Carroll, J.'s citation of the Belle Isle Ice Co. case in Cook v. Cook, 270 Mass. 534, 544, 170 N.E. 455.

112. I believe that the Massachusetts court would recognize that such a corporate liquidation was not technically the type of corporate dissolution which only the legislature could order or authorize. Folger v. Columbian Insurance Co., 99 Mass. 267, 275, 276, 96 Am.Dec. 747. See Leventhal v. Atlantic Finance Corp., 316 Mass. 194, 205, 55 N.E.2d 20, 154 A.L.R. 260. Compare Mass.G.L.(Ter.Ed.) c. 155, § 50; and that the court would conclude that in an appropriate case liquidation was a nonstatutory equitable remedy available to a minority stockholder who had, as the saying goes, been "frozen out" by controlling officers, directors and shareholders who had been using the corporation for fraudulent purposes and who could not be trusted to accord the minority a fair share of the fruits of the corporate enterprise. Such a conclusion recognizes that confining the shareholder to a limited decree requiring the faithless officers, directors and shareholders to make restoration to the corporation and enjoining them for further wrongdoing is often entirely inadequate. For such a limited decree often leaves the faithless in office or in control of those who are in office. Bernstein v. New Jersey Bankers Securities Co., 109 N.J.Eq. 233, 240, 156 A. 768, 770. And such a decree often casts upon the courts a heavy burden of continuing supervision or the equally unpleasant task of keeping the faithless in line by inflicting the penalties appropriate for contempt of court.

113. Although, after this long review of the authorities, I have concluded that under Massachusetts law I have the power to appoint a receiver in this case, I have with much hesitation reached the decision that it would not be desirable to do so.

114. I recognize that Warren S. Keith has not been a competent or prudent manager of other people's money. Indeed, I question whether he has the training or native ability ever to be a first-rate corporate executive even of a small enterprise. Up to now, at any rate, he has not shown a clear understanding of appropriate practices of corporate voting, corporate accounting or corporate management. He has not recognized the corporation's obligation to pay out to the preferred stockholders the dividends they have earned. He has not followed the provisions of the amended articles of association in redeeming the preferred stock. Instead he had adopted a haphazard method of redemption which may have been inequitable to some preferred stockholders. Some of his actions have been fraudulent in law if not in common understanding.

115. Moreover, he has fundamentally altered the relationship of the corporation to his family. In 1939 the corporation was the source of a meagre livelihood for his three brothers and himself. Today it is the source of a better livelihood for himself and his brother-in-law. It is no longer a place of employment for his brothers. These changes obviously are not legal wrongs to the corporation. But they have exacerbated the differences between the

members of the Keith family in their capacities as shareholders of the corporation and have thus indirectly made it more difficult for the corporation to prosper.

116. On the other hand, Warren S. Keith has always properly recorded all his own transactions with the company. Under his management in the 8 years from 1938 through 1946 when the business of distributing oil was adversely affected by war regulations, the corporation made profits of $34,537.66. He used these profits together with other funds (some of which may have been derived from the White Fuel Company mortgages) to acquire for the corporate treasury at a rate much faster than the preferred stockholders had a right to demand, 7,867 shares out of the 9,531 shares of preferred stock.

117. Weighing all these factors and bearing in mind the usually high costs of a receivership and the thin margin that this corporation has above the danger line I have as a matter of discretion determined not to appoint a receiver.

118. I have also considered whether I ought to enjoin Warren S. Keith from specified practices, such as excessive salary payments and borrowing corporate money without paying interest. My reason for not doing so is that he has not engaged in these practices since the settlement and I have no ground to anticipate his renewal of such improper conduct.

119. To enjoin him from voting his stock or requiring him to resign as officer or director would obviously be inappropriate unless a receiver were appointed. Otherwise, my decree would turn over the control of the corporation from him to his three younger brothers who also have previously abused their corporate positions and whose conduct does not command approbation.

120. To require Warren S. Keith to make regular and accurate reports, to make prompt payment of preferred stock dividends and to redeem preferred stock in accordance with the amended articles of association would be appropriate enough if there were a substantial risk that he would not follow those courses of action after the admonitions of this opinion. But I see

no reason to doubt that after this review of his conduct, Warren S. Keith will voluntarily abide by his duties as officer, director and controlling stockholder.

Decree dismissing complaints of plaintiff and intervening plaintiffs without costs.