George B. **HEDDENDORF**, for the Benefit of **EAST BOSTON COMPANY** and **Boston Port Development Company**

v.

Bernard **GOLDFINE** et al.

Civ. A. No. 56–356.

United States District Court
D. Massachusetts.

May 16, 1958.

As Amended May 20, 1958.

Preliminary Injunction May 28, 1958.

Supplemental Opinions Nov. 5, 1958 and Dec. 10, 1958.

Abraham Pomerantz, New York City, Jules E. Angoff, Boston, Mass., and Irvin M. Davis, Wellesley Hills, Mass., for George B. Heddendorf.

Harold Brown, Boston, Mass., for Joseph Galdi, Galdi Securities, Lillian A. Rosenfeld and Burnham & Co.

George Broomfield, John Fox, Boston, Mass., for Mildred W. Powell, Marion J. Haviland and Rita E. Doten.

William I. Schell, Boston, Mass., pro se.

Samuel P. Sears, Lawrence R. Cohen, and James W. Kelleher, Boston, Mass., for Bernard Goldfine, East Boston Co. and Boston Port Development Co.

David Burstein, Boston, Mass., for Bernard Goldfine.

Nyman H. Kolodny, Boston, Mass., for Jeremiah S. Connors.

Charles W. Bartlett, Boston, Mass., for Winthrop R. Scudder, individually and as Administrator of Estate of William J. McDonald.

Ralph Slobodkin and Albert R. Mezoff, Boston, Mass., for defendants Gross and Packard.

WYZANSKI, District Judge.

This action was brought on April 26, 1956, by Heddendorf, a citizen of Maine, against the East Boston Company, a Massachusetts corporation, of which he is, and since August 1, 1949, has been, a shareholder, and against individual defendants, all citizens of Massachusetts. Jurisdiction rests on diversity of citizenship.

All parties of record having entered on March 18, 1958, into a stipulation of agreement, settling this action, the parties filed a motion for judgment in accordance with the settlement. March 19, 1958, this Court, mindful of the provision of Fed.Rules Civ.Proc. rule 23(c), 28 U.S.C.A., directing that "a class action shall not be dismissed or compromised without the approval of the court", ordered that a hearing on the motion should be held on April 16. The Court prescribed the notice to be given. Shareholders of both East Boston (hereinafter called "the parent") and its subsidiary Boston Port Development Company, another Massachusetts corporation (hereinafter called "the subsidiary"), as well as the parties to this case presented testimony and arguments on April 16, 29, and 30 and were given until May 13 to file briefs.

At this stage the chief issue is whether this Court shall approve the compromise settlement and enter judgment accordingly. The Court, not having heard the full evidence available on the merits, does not purport to reach any conclusion which forecloses it from reaching different conclusions on a record of that full evidence.

For present purposes, the starting point is not the original complaint, but plaintiff's amended complaint filed October 1, 1956. That amended complaint recites the status of the parties and alleges that defendant Goldfine owns 42% of the stock of East Boston, that defendant Scudder individually and as administrator of the late McDonald owns 19% of the stock of East Boston and is subservient to Goldfine, that Goldfine has caused certain other defendants to be selected as directors and officers of East Boston and its subsidiary Boston Port and these other persons take their instructions solely from Goldfine, and that Goldfine and the other individual defendants, by their acts and omissions, pursuant to a conspiracy, wrongfully caused losses to the subsidiary.

Then follow detailed allegations which may be conveniently summarized in eight categories.

First, plaintiff alleges borrowings from the subsidiary. As of December 31, 1954, Goldfine is said to owe $129,477.65 including interest; defendant Connors, on non-interest bearing notes, $178,833.-34; defendant Scudder, on non-interest bearing notes $24,300; McDonald, partially on non-interest bearing debts, $119,752.19; Chase Brothers, on non-interest bearing obligations, $30,200, and Chase, on non-interest bearing obligations, $13,000.

Second, plaintiff alleges that, with a view to concealing these borrowings and to allowing them to be outlawed by the statute of limitations, the claimed conspirators caused the parent not to file with the S.E.C. reports and caused the

parent not to make full reports to shareholders.

Third, plaintiff alleges that the claimed conspirators have allowed the subsidiary to continue to make additional loans to Scudder, in excess of $30,000, and Connors at the rate of $20,000 a year.

Fourth, plaintiff alleges that defendants caused the subsidiary to pay to themselves and others unwarranted so-called expenses.

Fifth, plaintiff alleges that defendants caused (a) the subsidiary to purchase, in the name of a straw, property at 202–208 Boylston Street, Boston, on January 23, 1947, (b) the straw to mortgage that property, and (c) no account of the proceeds to be made to the subsidiary. Moreover, defendants suffered tax liens and attachments to be created against the property.

Sixth, plaintiff alleges that defendants caused (a) the subsidiary to purchase, in the name of a straw property at 210–212 Boylston Street, Boston, on May 14, 1945, (b) the straw to give the subsidiary a mortgage on the property to secure a note for $75,000, (c) the subsidiary to discharge without consideration the subsidiary's mortgage, (d) the straw to give, without consideration, a note for $50,000 and a new mortgage to a conduit who assigned both note and mortgage to defendant Goldfine's wife, and (e) the straw to give a junior mortgage to the subsidiary to secure its $75,000 note. Moreover, defendants suffered tax liens and attachments to be created against the property.

Seventh, plaintiff alleges that defendants caused (a) the subsidiary to purchase, in the name of a straw the Little Building at the corner of Boylston and Tremont Streets, on August 1, 1946, (b) in 1949 the straw to transfer that property to The Little Building Trust, Inc., a corporation dominated by defendant Goldfine, and (c) that corporation to give a first mortgage of $1,000,000 to an unspecified person, a second mortgage of $500,000 to the subsidiary, and a third mortgage of $500,000, without consideration, to defendant Goldfine.

Eighth, plaintiff alleges that during past years the subsidiary has received income of about two million dollars, largely out of the sale of its real property, that neither the subsidiary nor the parent has declared any dividends, that neither has filed the certificates of condition required by Massachusetts law, and that they have caused both corporations not to hold shareholders' or directors' meetings.

The amended complaint recites in detail the futility of plaintiff making upon the directors and shareholders of the parent and subsidiary corporations a demand for action by them. The prayer asks for (a) an accounting by the individual defendants to the parent and the subsidiary, (b) repayments by the individual defendants, (c) declarations that the subsidiary owns 202–208 Boylston Street, 210–212 Boylston Street, and the Little Building, (d) appropriate action with respect to the mortgages and (e) "a receiver to be appointed for the parent and the subsidiary to take over their management and all of their business, affairs, and property."

Defendants filed various motions. On October 24, 1956, the Court denied defendants' motion for a more definite statement. November 28, 1956, the Court denied Connors' motion to dismiss. November 30, 1956, defendants filed answers. In the meantime, beginning in November 1956, plaintiff began taking depositions, of which notices appeared on this Court's docket November 6, 1956, March 27 and 28, 1957, August 19, 1957, October 23 and 28, 1957, and November 20 and 25, 1957.

This Court set the case to be heard, on the merits, on assigned dates first on September 12, 1956, second on September 9, 1957, and third on January 13, 1958. On each occasion all counsel requested postponement.

In the meantime, despite the publicity which the case had received, Mary J Janesco was the only person who sought

to intervene. On December 27, 1957, Mr. Pomerantz and his associates, who throughout the proceedings have been counsel for plaintiff Heddendorf, filed Mary J. Janesco's motion to intervene. Her object was to take advantage of the fact that she became a stockholder of the subsidiary on January 9, 1942, more than 7 years before Heddendorf became a stockholder of the parent and that she was therefore not precluded by Fed.Civ. Proc.Rule 23(b) from complaining of transactions between January 9, 1942 and August 1, 1949. On January 7, 1958, this Court denied Janesco's application to intervene "on the ground that it is not timely, this case, after postponements, having been set for Monday, January 13, 1958."

By January 13, 1958, the day set for the trial, Mr. Pomerantz, Heddendorf's counsel, and Mr. Sears as counsel for most of the defendants had worked out a general plan for compromising this case. From that general plan emerged the settlement proposal of March 18, 1958, filed March 19, 1958. The background of Mr. Pomerantz's willingness to make this compromise he explained in open court on April 16, 1958. What he said, while not agreed to by counsel for defendants, was not contradicted by them. And they joined in plaintiff's motion for approval of the compromise.

Before stating the proposed settlement, it will be convenient, though out of chronological order, to summarize Mr. Pomerantz's view of what he had discovered by diligent pre-trial discovery, including the taking of the depositions of Bernard Goldfine, Mildred Paperman, Benjamin Brown, Pilgrim Trust Co., Second Bank-State St. Trust Co., Samuel W. Chase, Horace M. Goldfine, Alwyne F. Jealous, Clarence Tichell, Marcien Jenckes, Roland M. Packard, B. Ralph Slobodkin, and Henry Atherton.

Regarding the loans embraced by the first three categories of the complaint, Mr. Pomerantz on April 16, 1958, stated that on the view most favorable to his client the subsidiary had a claim of "$299,699 principal, including $99,000 principal due from Mr. Goldfine for loans and advances which he received improperly in our view." (Tr. 7.) But Mr. Pomerantz observed that there were possible defenses including the statute of limitations (Tr. 7), and services rendered (Tr. 9).

Regarding the expenses alleged in the fourth category of the complaint, Mr. Pomerantz stated that his view was that "the improper disbursements and expenses, run to $106,000" (Tr. 7).

Regarding interest on sums which the plaintiff alleges that defendant Goldfine owes (sums which are stated in different parts of the complaint), Mr. Pomerantz stated that Goldfine owes the subsidiary $67,833 (Tr. 9). But he noted that Goldfine urges as a partial defense that he did not charge interest when he lent money to the subsidiary (Tr. 15).

Regarding the two properties at 202-208 Boylston St. and 210-212 Boylston St., Mr. Pomerantz was vague (Tr. 12-13) but indicated that his investigation had not substantiated the complaint. But he pointed out that the $50,000 mortgage on 210-212 Boylston St. given to Mrs. Goldfine had, as a result of this litigation, been cancelled of record (Tr. 13).

Regarding the Little Building claim, embraced in the seventh category of the complaint, Mr. Pomerantz stated that the complaint was "wrong". "The circumstantial evidence overwhelmingly indicates that from the day title was taken Mr. Goldfine received all of the rents, paid all of the expenses, and *ante litem* behaved as the owner of a property behaves." (Tr. 11-12.)

With this background of what the plaintiff's lawyers regarded as provable, they entered into the compromise now before the Court. Its essence provides:

1. Defendant Goldfine shall pay to the subsidiary over a two year period $400,000 as follows: $125,000 upon the entry of final judgment and elapse of the appeal time, $75,000 one year thereafter, $75,000 six months later, $62,500 six months later, and $62,500 six months

later (or on December 31, 1960, if that is later).

2. Defendant Petit, holder of record title to the two parcels at 202–208 and 210–212 Boylston St., shall convey those parcels to the subsidiary.

3. The subsidiary shall be declared to have no valid claim to the Little Building, other than its mortgage of record.

4. The payments by defendant Goldfine shall constitute a compromise settlement of all claims (against him as well as others) relating to any transaction in connection with the complaint.

5. The complaint shall be dismissed with prejudice to the subsidiary and its stockholders "to commence any further proceeding against any of the defendants with respect to any and all claims * * * in any way based upon any transaction * * * appearing, directly or indirectly, in the above entitled action and the complaint filed therein, or which could have been alleged or asserted thereunder."

After the parties gave notice of and circulated the proposed compromise, some shareholders appeared personally and others by counsel at the hearing on April 16, 1958 and at subsequent hearings to oppose confirmation of the plan. None of these counsel brought forward any significant evidence in addition to that which Mr. Pomerantz developed. None of them sought to intervene before the hearing on April 16, despite the hardly secret pendency of this case in this Court. On April 16, on behalf of various shareholders Mr. Brown intervened to ask the Court to disapprove the compromise settlement and to appoint a receiver. (Tr. 23–25.)

The chief objections raised on April 16 and thereafter were four:

1. The amount to be paid by Goldfine, especially considering the installment method of payment, was too low even to meet the principal amount of borrowings and expenses for which he could be held accountable, and much too low when interest was taken into account.

2. The compromise erroneously discharged the subsidiary from liability in connection with the subsidiary's or parent's purchase in the 1930 decade of stock in the Eastern Racing Association (Tr. 166, 195–196).

3. The compromise did not fairly appraise the validity of the claim involving The Little Building.

4. The compromise was defective in leaving a wrongdoer in control of the subsidiary and the parent, and in control of the fruits of this litigation, when justice required the appointment by this Court of a receiver, as prayed in the complaint. (Tr. 23–26, 22–33.)

The first objection would not be fatal if looked at in isolation. Mr. Pomerantz has with intelligence, resourcefulness, and industry developed all the facts now available as to the subsidiary's loans. Subsequent investigation may turn up more evidence. But there has been a thorough preliminary canvass. Moreover, Mr. Pomerantz's judgment as to the value of so much of the claims as fall within the first four categories of the complaint is a judgment not only based on painstaking preparation but also reflecting an almost unparalleled experience in this type of litigation. As he himself repeatedly stressed, he is naturally biased by a self-interest in securing as large an amount from the defendant Goldfine as possible. His support of the compromise embodies the pragmatism of a man whose shrewdness few antagonists have ever doubted. And the evidence offered at the hearing in no way indicates any defect in Mr. Pomerantz's appraisal of the claims against Goldfine for loans, borrowings, expenditures, and the like, and of the defenses to those claims.

The second objection presented to the Court by Mr. Fox, apparently without support of any other intervenor, rests upon a misconception of the present complaint. There is nothing in the present complaint which refers to any transaction before 1942 when Goldfine and McDonald began to acquire their inter-

ests in the parent and subsidiary. If there are wrongs other than those directly or indirectly referred to in the complaint, the proposed compromise does not in any way deal with them or bar recovery thereon. Mr. Fox's objection is completely without merit.

The third objection raises a difficult point. The proposed compromise seeks to bar the subsidiary corporation and also any shareholder in it or the parent corporation from making hereafter any claim not merely on account of the operation of the Little Building since August 1, 1949, when the plaintiff Heddendorf became a stockholder, but also on account of its acquisition in 1946 and its operation in the three subsequent years. Unless the settlement reaches the three earlier years the defendants do not want to be a party to it, and Goldfine will not pay the $400,000. (Tr. 256.)

For the moment we may assume that this Court has the power in its discretion to enter a judgment barring claims arising in the 1946–1949 period. Occasionally a court, whether correctly or not, has approved of a settlement reaching a transaction not covered by the pleadings, if the transaction was cognate to those covered and had been fully inquired into by the court. Winkelman v. General Motors Corp., D.C.S.D.N.Y., 48 F.Supp. 500. Cf. Pergament v. Frazer, D.C.E.D.Mich., 93 F.Supp. 13, affirmed sub. nom. Masterson v. Pergament, 6 Cir., 203 F.2d 315; see also Stella v. Kaiser, 2 Cir., 218 F.2d 64. Moreover, this Court could widen the formal pleadings so as to reach the 1946–1949 conduct of defendants. By reversing its ruling made on January 7, 1958, it could now allow Janesco or some other early stockholder to intervene and file an amended complaint covering the 1946–1949 period. Then this Court could enter, though perhaps not immediately, a judgment which would act as an estoppel against further actions for wrongs in that period.

But the real difficulty is not whether this Court has, or by some technical sleight of hand can achieve, power to foreclose a claim based on the 1946–1949

transactions concerning the Little Building. The question is whether this Court should do so.

At this point it is important to state the situation with the greatest reserve. For this Court repeats that it has not heard the full evidence. The oral and written testimony given in Court on April 29, 1958 and the depositions then offered in evidence were merely to aid the Court in deciding whether or not to approve the compromise or to appoint a receiver.

From the evidence so far offered by stipulation, deposition, or witnesses in court, it *looks* as though there might be a substantial claim with respect to the acquisition in 1946 of the Little Building.

Before the building was sold the then owner held it subject to an $835,000 mortgage for the Suffolk Savings Bank (Tr. 64). On July 29, 1946, the then owner transferred for $1,525,000, or $690,000 above the mortgage (Tr. 84), not merely the equity but also the right to any cash rebates or refunds that might be allowed by the City of Boston on account of taxes for the years 1942–1945 (Tr. 65, 74–75).

To pay this $690,000 for the property Goldfine made deposits of $50,000 in April 1956 (Tr. 85–86) and of $640,000 on July 29, 1956. This $640,000 consisted of $445,000 cash borrowed from the subsidiary (Tr. 66) and $195,000 from a disputed source. There is some suggestion but no agreement that whoever advanced the $195,000 was reimbursed in part from the proceeds of tax refunds. For within less than a month thereafter, on August 13, 1954, the city paid to some one rebates of $18,597.84 for the years 1942 and 1943 and $39,-305.31 for the years 1944 and 1945 (Tr. 74).

After the transfer, the legal title to the property was subject first to the Suffolk Savings Bank mortgage, second to a mortgage of $215,000 to Goldfine's wife and brother, third to a mortgage of $500,000 to the subsidiary (Boston Port), and fourth to a $500,000 mortgage to

Goldfine and McDonald. Ultimately the second mortgage was paid.

As of today, the title to the Little Building is in the Little Building Trust, Inc. (Tr. 93), a defendant in this case, and a corporation in which Goldfine has an interest. There are now on the property a first mortgage to Mutual Life Insurance Co., originally in the amount of $1,000,000, now reduced to $757,068.-70 (Tr. 56, 199); and a second mortgage to the subsidiary originally in the amount of $500,000, now reduced to $450,000. (Tr. 199.)

It would be undesirable for the Court at this juncture to express any binding opinion as to what can be spelled out from these facts alone, or from these facts taken in connection with the number of shares of the subsidiary or parent owned by Goldfine and by McDonald. It will be quite sufficient to say that if Goldfine, alone or with another, was in control of the subsidiary, and he arranged to pay for the equity and the right to receive tax rebates by putting up (a) $50,000 of his money, (b) $445,-000 of the subsidiary's money, and (c) $195,000 borrowed against potential tax refunds, it *may* have been improper for the subsidiary to have received only a second mortgage for $500,000 while Goldfine or a company in which he was interested received the equity in the Little Building property.

There is at the least a *plausible* claim that the subsidiary was entitled to be treated as an equity owner. Familiar doctrines of "corporate opportunity" and of "resulting trust" *may* have application to this case. And, if they do, then the potential recovery against Goldfine in this situation far exceeds $400,000, as is shown by a fair estimate of the present value of the Little Building and by the record of the earnings of the Little Building in the last decade. Indeed that record of net earnings may itself be an understatement of the true net earnings, when the claimed expenses are carefully scrutinized and checked.

But if there is possible validity in this Little Building claim, the question may properly be asked did not Mr. Pomerantz

know the claim and appraise it, and is there any ground for disregarding in this connection a judgment of a person already described as discerning and shrewd. To this the answer is that Mr. Pomerantz having been denied on January 7, 1958, in connection with Janesco's motion the right to present issues arising prior to August 1, 1949, he quite correctly concluded that for his client Heddendorf the 1946–1949 transactions were relatively unimportant. He was more than willing to take for that claim a small allowance from defendants—a much smaller allowance than the claim might be worth either to the defendants or to other shareholders who (if Winkelman v. General Motors Corp. be sound law) would be barred by the proposed compromises.

■ There is one more point that the objectors make—that this compromise continues in office managements that by acts of commission and omission have gravely wronged the subsidiary, the parent, and the shareholders and creditors of each, and that have been constantly ignoring the state and federal statutes and principles of corporate law requiring disclosure of information for the benefit of interested persons and of the public; and that for this situation a receivership is an appropriate intermediate procedural device, as the amended complaint itself recognizes.

■ This being a case within the diversity jurisdiction of this Court the initial question is whether this Court has power to appoint a receiver. My views on this subject were set forth in Ashley v. Keith Oil Corp., D.C.D.Mass., 73 F.Supp. 37, 55–57. No case since then seems to have thrown further light on the relevant law of Massachusetts. See Whittemore, J., in Mount Hope Finishing Co. v. Daylor, 1956, 335 Mass. 84, 138 N.E.2d 373. In accordance with the Keith Oil Corp. precedent, I conclude that (1) in a diversity jurisdiction suit, Massachusetts state law determines whether and under what conditions a stockholder has a substantive right to have a receiver of his corporation appointed, and (2) under Massachusetts

law on a stockholder's complaint that those in control of a corporation have been managing it fraudulently, a court has (a) the power to appoint a receiver for the conservation of assets including any sums recovered as a result of the complaint and probably (b) the power, if the mismanagement has been so serious that lesser remedies are inadequate, even to direct the receiver to liquidate the corporation.

The Court having these powers, the question is whether to achieve justice in the case at bar it is proper to approve a settlement which would preclude the use of a receivership as at least a temporary safeguard. A receivership would give these opportunities. It would be a cathartic more fully disclosing all the wrongs heretofore perpetrated by persons who on the evidence already received have been shown *prima facie* to have committed breaches of duty. It would give assurance that any recovery in this case would reach its appropriate recipients. It would remove the wrongdoers or their instrumentalities from control at least temporarily. It would give the Court the chance to consider whether permanently to enjoin them from voting or holding office or directly or indirectly exercising control. Cf. Ashley v. Keith Oil Corp., 73 F.Supp. at page 58, conclusion number 119.

Mr. Pomerantz's willingness to enter into a settlement without a receivership, or bar against wrongdoers continuing in office, does not seem to me of paramount significance. With commendable candor Mr. Pomerantz asserted in open court that he was strongly motivated in this case by his self-interest and the interest of Heddendorf. And a receivership, unless Mr. Pomerantz were the receiver, would hardly serve those interests. He is chiefly concerned about the past misdeeds of mismanagements and the past of the corporations they mulcted. Quite naturally, his principal interest in the future is in that part of the corporation's recovery which goes toward repaying plaintiff for his expenses, not that part which goes into the till to be managed in the future by those who settled claims brought against them for their alleged wrongdoing. This is underlined by the standard provision in paragraph (1) of the proposed settlement that the Clerk of this Court shall use the first $125,000 to be received from Goldfine for "reimbursement of plaintiff's expenses."

Looking at the matter then not merely from the plaintiff's point of view but taking into account, in accordance with Fed.Civ.Proc. Rule 23(c), the interest of all stockholders and of the general public, this Court finds a fundamental defect in the proposed settlement the absence of any provision for a receiver. To support this finding it is enough to call attention to the cumulative effect of these patently non-frivolous claims *prima facie* supported by evidence received at the hearings: Goldfine's alleged malfeasance, the alleged continuing subservience of the directors and officers to Goldfine, the alleged negligence of the directors and officers in making reports required by federal and state law, and the contention that the present assets of Boston Port Development Company include a share not merely in the equity in and past earnings of the Little Building but also in current receipts from its operation.

In this situation which involves far more than a single episode of alleged misconduct, a compromise which involves the alleged chief wrongdoer in a mere payment of money does not adequately consider the future welfare of the corporation and its shareholders. This point is unfortunately emphasized by a proposed settlement that not only fails to preclude the alleged malefactors from further wrong, but even seeks to preclude other shareholders from pursuing the alleged malefactors for past wrongs not reachable by the amended complaint.

This case should not stand in the way of future compromises where the plaintiff stockholders and the defendant present a settlement plan (a) limited to the acts covered in the complaint and (b) *in those exceptional cases where there has been a long history of deliberate and elementary breaches of duty* providing

for restraints on future wrongdoing or for replacement of management.

### PRELIMINARY INJUNCTION

This Court, after argument and opportunity to be heard by all affected parties, having allowed the motion of defendants for entry of a preliminary injunction against them, it is now

### ORDERED, ADJUDGED AND DECREED

1. That subject to further order of the Court the defendant East Boston Company, its agents, officers, attorneys, and servants be restrained and enjoined from making any transfer or disposition of any property or entering into any contract or transaction or making any payment of any kind whatsoever to any person other than payment on account of taxes due and payable to a governmental authority.

2. That Boston Port Development Company, its agents, officers, attorneys, and servants be restrained and enjoined from making any transfer or other disposition of any of its funds or other property or entering into any contract or transaction of any kind or making any payment of any of its funds except, (i) as approved by the Court; (ii) of ordinary, necessary and routine expenses such as office expenses, rent and light, insurance, telephone and telegraph to the extent only that such expenses do not exceed more than $6,000 during any twelve months period, and not including any payment whatsoever in the nature of salaries or compensation to any person whatsoever; (iii) taxes due and payable to any governmental authority; (iv) interest on existing debt.

3. That each of said corporations be enjoined from paying, and the said Goldfine be enjoined from receiving, directly or indirectly any money or property of any kind, that payment to any relative or employee of Goldfine or any corporation in which he may be directly or indirectly interested may for this purpose be considered to be payment to Goldfine; and that each of said corporations adopt appropriate resolutions to require that all checks or drafts for the payment of money be countersigned by a firm of independent certified public accountants appointed or approved by the Court.

4. That defendants be restrained from the assignment, transfer, pledging or otherwise disposing of or encumbering any of the 111,065 shares of East Boston Company and the 5108 shares of Boston Port Development Company referred to in the motion.

5. That the defendants and each of them be restrained and enjoined from assigning, transferring, conveying, encumbering or otherwise disposing of any right, title or interest in the property known as the Little Building and that said Bernard Goldfine be directed to cause a faithful, accurate and complete accounting to be made by any of the defendants as to any matter hereafter occurring and in any way relating to the management and operation of the Little Building to the extent that any such matter be deemed pertinent by the Court.

### Supplemental Opinion

This action was brought by Heddendorf against the East Boston Company, of which he is a stockholder, and against Bernard Goldfine and other individual defendants. This Court's opinion of May 16, 1958, as amended May 20, 1958, recites the nature of the claims and the developments of the case up to then. By its orders in May 1958 this Court refused approval of what may be called the first settlement plan which had been proposed by the defendants and by the original plaintiff, Heddendorf, but which was opposed by several persons who had or have intervened as plaintiffs.

In June and again in August defendants conducted negotiations with all the parties of record. Through their joint efforts, there emerged a new proposed settlement. The parties laid this proposal before this Court on September 22, 1958. This Court directed that defendants should circulate the new plan to all stockholders of East Boston and Boston Port, to the S.E.C., the U. S. Attorney General, the U. S. District Attorney, the Massachusetts Attorney General, the Massachusetts Commissioner of Corpora-

tions and Taxation, and the Mayor of the City of Boston.

The Court had the *admittedly unexpressed* hope that a shareholder or possibly one of these public authorities would put its finger on what seemed an obvious weakness in the plan—the fact that it rested on inadequate disclosures by and examination of Goldfine.

But though defendants fully complied with this direction to give notice to all shareholders and to public authorities, no one has come forward with a suggestion for further inquiry into Goldfine's alleged mismanagement.

On November 3, 1958, this Court held a hearing on the issue whether the new settlement plan should be approved. At this hearing the Massachusetts Commissioner of Corporations and Taxation and the City of Boston sought to intervene for a limited purpose. Neither the Commonwealth nor the city showed any concern with Goldfine's lack of disclosure. They, as creditors, were seeking nothing more than immediate payment prior to shareholders and in a manner, so far as they knew, unprecedented in minority shareholders' suits to which creditors were not parties. Since it appeared that they had no *in rem* and indeed no *in personam* interests which required protection in this litigation, this Court denied the pleas for intervention by the officials of the Commonwealth and of the city.

The requested creditors' interventions having been denied, defendant Goldfine's counsel stated the nature of the new plan, referred to the more complete exposition he had made of the basically similar plan offered in open court on June 18, 1958, and proposed further amendments to the plan (such as a deferral of payment to Goldfine, a pledge of his stock, and postponement of payment of a debt due to a company in which he was interested), all of which augmented the value of the offer made to minority stockholders.

No stockholder has in open court, or by pleading or other appropriate communication, objected to the plan of September 22 as it has now been amended. On the contrary, all stockholders who have expressed themselves have given their approval to the present version of the proffered compromise. Moreover, on its face, the plan in its cash and other provisions is plainly more favorable to the minority stockholders than was the original plan considered in this Court's opinion of May 16. The financial payments are approximately 50% better; the Little Building questions are resolved in a way that gives at least an appreciable benefit to the minority; and risks of future mismanagement are obviated. All the considerations stated in this paragraph are strong reasons for this Court giving its approval to the settlement plan as it now stands. Moreover, it is not irrelevant that no one has shown a wish to pay the expenses of future litigation with all its attendant risks. Cf. Moore's Federal Practice, vol. 3, p. 3553, note 18.

Yet there is one aspect of this case which with a due regard to its duty this Court cannot let pass unnoticed. This Court, like the general public, is aware that during hearings before a committee of Congress it appeared that one or both of the two corporations involved in this case purchased cashier's checks which were used for undisclosed purposes. This is *not* a matter of which the Court takes judicial notice, as though it were evidence. But it is a matter which is relevant in deciding whether the Court by approving a settlement should, in effect, block further inquiry and reparation.

Needless to add, it is *not* the concern of this Court in the present stockholder's suit to inquire as to whether the use of these checks violated some criminal law, some tax law, or some regulatory enactment, national or local. Nor is it this Court's concern to serve in these proceedings as an auxiliary to a Congressional committee, or to aid a prosecution for contempt of Congress.

This Court is concerned with, and only with, a civil role which has been thrust upon it by the Rules of Civil Procedure promulgated by the Supreme Court of the United States and reported to Congress by the Attorney-General. Under Rule 23(c) it is provided that "a class action" of the type at bar "shall not be

dismissed or compromised without the approval of the court." Thus the Court is in a posture quite different from that which exists in an ordinary litigation in, say, for example, contract or tort, where the traditional view is that the judge merely resolves issues submitted to him by the parties, asks only such questions as clarify the contentions of the litigants, and stands indifferent when the parties, for whatever reason commends itself to them, choose to settle a litigation. Compare Note, 73 Law Quarterly Review 284–286.

In compromises of class actions, such as minority stockholders' suits, the District Court has been placed by higher authority in the role of what has been called "a third party to the compromise". (Masterson v. Pergament, 6 Cir., 203 F.2d 315, 330, col. 2, 9 lines from bottom of the page), and what might perhaps be better called *a guardian of absent parties and of the corporation as a whole*. Cf. Piccard v. Sperry Corp., D.C.S.D.N.Y., 36 F.Supp. 1006, 1009–1010, affirmed per curiam 2 Cir., 120 F.2d 328; Upson v. Otis, 2 Cir., 155 F.2d 606, 614–615; Birnbaum v. Birrell, D.C.S.D.N.Y., 17 F.R.D. 409. Note 71 Harv.L.Rev. 874, 955, note 582. Moore's Federal Practice vol. 3, 3551–3560. The silence or the absence of shareholders does not relieve the judge of his duty. Indeed it may charge him with an added responsibility, at least in cases where the facts proved in his court and others revealed in other public tribunals strongly suggest that wrongs were done to the corporation for which extensive reparation may be due. Cf. Note, 54 Harv.L.Rev. 833, 838–839.

Just such responsibility arises here. If (and the word "if" should be underlined) the defendant Bernard Goldfine used a check bought with funds or credits of one of these corporations in such a way as to produce a profit, or like financially measurable advantage, for himself, or a confederate to whom the check was lent or by whom it was cashed, such profit or advantage may belong in equity to the corporation, and the assets available to shareholders might thereby be perceptibly increased. This is nothing but an exemplification of the general and familiar rules of constructive trusts. Scott on Trusts, 2d Ed., § 503; Restatement Agency, § 404; Production Machine Co. v. Howe, 327 Mass. 372, 378, 99 N.E.2d 32; Note 63 Harv.L.Rev. 1446–1448; 3, Fletcher, Cyclopedia of Corporations, § 888.

This Court does not find it necessary to consider for what reasons lawyers who have appeared in court as counsel for the plaintiffs and intervenors chose not to make defendant Goldfine answer under oath what he knew about the cashiers' or certified checks. Of course, a particular plaintiff or his lawyer may have reasons peculiar to himself for not prosecuting such an inquiry. And it may be that inquiry along these lines was for some reason foreign to the powers vested in, principles governing, or interests represented by the S.E.C., U. S. Department of Justice, or local Massachusetts authorities. But, whatever may be the limitations others accepted, this Court, *on behalf of its wards*, the unrepresented stockholders, cannot approve a compromise settlement until the Court knows from what debts, and from what size claims, it is releasing defendant Bernard Goldfine and others. Piccard v. Sperry Corp., D.C.S.D.N.Y., 36 F.Supp. 1006, 1009–1010, affirmed per curiam 2 Cir., 120 F.2d 328. Cf. Ladd v. Brickley, 1 Cir., 158 F.2d 212, 215–220; Upson v. Otis, 2 Cir., 155 F.2d 606, 614–615.

Hence this Court *will withhold its approval of the compromise settlement* now before it until defendant Goldfine files under oath a complete statement with respect to each cashier's check and each certified check of either of the defendant corporations. To be satisfactory such statement must cover all checks (whether or not defendant Goldfine personally handled them) and must cover all details of the use of the checks made by any holder thereof (whether or not he was an officer or employee of one of the defendant corporations).

The only sanction this Court is suggesting *at this time* is the withholding of its approval of the compromise. That is, the defendants run whatever risk there

may be in a full trial, full interrogation, and full payment of whatever liabilities may be judicially ascertained thereafter. And the defendants also run the risk that in view of the reluctance of counsel of record to make inquiry about these checks, this Court will appoint a receiver, or will name a trustee, or will appoint a counsel for unrepresented shareholders, to make suitable investigation by deposition or other discovery proceedings and to bring such evidence as he uncovers before the Court in an appropriate manner. [Compare the appointment by Judge Ford of Bartholomew A. Brickley, Esq. in the International Hydro-Electric System case, reviewed in Ladd v. Brickley, 1 Cir., 158 F.2d 212, 214, col. 1, lines 11–14. See also General Investment Corp. v. Warriner, 1st Dept., 259 App. Div. 400, 19 N.Y.S.2d 566; 54 Harv.L. Rev. 833, 839.]

The defendant Goldfine is given until Friday, December 5, 1958, to supply the suggested information or to face as a consequence this Court's disapproval on that day of the proposed settlement.

### Additional Supplemental Opinion

This case is now before the Court on the motions of the defendants and of the original plaintiff that the Court approve a so-called second compromise settlement. Copies of the proposed settlement have been circulated to all shareholders and other interested parties. No one has opposed, and many have approved, the settlement.

Before taking final action on this second compromise, this Court on November 5, 1958, filed an opinion pointing out that there had been no statement to the Court as to one aspect of the conduct of the defendant corporations and the individual defendant Bernard Goldfine. That aspect related to certain certified checks and cashiers' checks purchased with funds of Boston Port Development Company. Inasmuch as under the proposed settlement the defendants' liability, if any, with respect to these checks would be extinguished, as a result of the blanket release provisions of the proposed settlement, this Court indicated that it would not approve the compromise settlement until the Court knew what were the facts with respect to the checks.

In its November 5 opinion, the Court *suggested* that the way to inform the Court of the facts with respect to those checks was for defendant Goldfine to file a detailed affidavit. The Court said that it would allow Goldfine until December 5 to file that affidavit. While one intervening plaintiff subsequently asked the Court to withdraw this suggestion, the original plaintiff and at least three separate intervening plaintiffs expressed approval of this Court's action of November 5.

On December 5, Samuel P. Sears, Esq., with the specific approval of his client, defendant Goldfine, appeared in court with a draft of the affidavit, and stated that because his client was fogbound in New York it would be difficult to get the draft approved in final form and executed by Goldfine on that day. Acting on this representation, this Court extended the time of filing until yesterday, December 9. Nonetheless, on that December 5, Mr. Sears or his associate, Lawrence Cohen, Esq., showed portions of the annexes to the proposed affidavit to members of the press. Details of the annexes appeared in a Boston newspaper.

On Tuesday, December 9, Mr. Sears informed the Court that defendant Goldfine did not choose to sign the affidavit. Mr. Sears recognized that on the previous Friday, December 5, he had made a representation or something close thereto with the purpose and effect of inducing the Court to postpone its judicial action. Also, in response to the Court's questions, Mr. Sears stated that defendant Goldfine knew Mr. Sears was coming before the Court on Friday for an extension, and that counsel had shown the press the list of checks annexed to the affidavit.

Being aware that by public disclosure, and by action authorized by their client, Messrs Sears and Cohen had

abandoned whatever privilege of attorney and client might have existed with respect to the draft affidavit, this Court requested counsel to file the affidavit without defendant Goldfine's signature.

Mr. Sears promptly complied yesterday afternoon.

The Court assumes that, under these circumstances, the draft before the Court, having been prepared by counsel of acknowledged competence and professional reputation, is as accurate and complete as if it had been formally executed. The Court, were it necessary so to decide, might even infer that defendant Goldfine adopted on Friday the main provisions of the affidavit, and merely reserved until Tuesday the right to check details and to attach his signature.

In this posture of the case it would be excessively formalistic to regard what has been filed in this Court as not meeting the mere suggestion made by this Court on November 5,—more particularly inasmuch as the Court made it clear on that day that its suggestion was in no sense an "order".

This Court has never desired to create a situation in which, by the device of a statement under oath, defendant Goldfine would be led into a perjury prosecution. This Court deprecates and has no intention of adopting the recent habit of certain other judicial, executive, and legislative authorities of resorting to a legal mechanism for reaching back into an affiant's earlier conduct, which cannot be directly prosecuted because of statutes of limitation or like principles of repose, and substituting for that direct prosecution a situation in which there may lie a prosecution for perjury. Such indirection may be legal. It may be due process. But those who understand the historical and moral principles of our law recognize that it is not fair play. It is unworthy of a great republic that cherishes the rule of law.

Being satisfied that the statement filed by Mr. Sears fully meets the proper scope of this Court's interest, this Court has inspected the statement. There may be in that statement indications of a possible violation of a corrupt practices statute. There may be other items which deserve scrutiny. But those considerations are irrelevant to the issues before this Court.

The issues before this Court are: first, does this Court now know enough about the facts of the alleged wrongdoing of Goldfine to pass upon the compromise; and second, on the facts disclosed to the Court, is it fair to stockholders who are not before the court in person or by counsel, to approve a final settlement of all claims that could be made against the individual defendants for conduct during the period covered by the proposed compromise.

On both issues the Court is quite clear that an affirmative answer is the only correct answer. What Mr. Sears has disclosed, as well as what Messrs. Pomerantz and Brown have disclosed in their letters, persuades this Court that it now knows all the significant facts. Taking into account the risks of litigation, the expense of litigation, the amounts offered by defendant Goldfine, and the amounts which under any conceivable settlement could reach minority stockholders, this Court concludes that the compromise is not only fair, it is generous.

While, in general, this Court has some doubt whether it is desirable for a tribunal to release defendants from liability not only for specific items of disclosed wrongdoing but also for any undisclosed wrongdoing during a defined period, the Court has no scruples in approving in this case such a general release. Here we have had the benefit of the most intensive investigation by one of the country's foremost specialists in this type of litigation. We have had an abundance of depositions. There has been a thorough canvas by a committee of Congress. This Court itself has conducted a number of hearings and has even gone so far as to open up a suggested line of evidence. On the special facts of this case, a general release is appropriate. But the

special facts may not be paralleled in other litigation. And so this case may not serve as a broad precedent.

I, therefore, effective today grant the motions and approve the so-called second compromise settlement.

On Monday, December 29, 1958, at 11 a.m. I shall hear applications by counsel, by accountants, by the court-appointed receiver and others for compensation, in accordance with the usual practice. No later than Monday, December 22, 1958, each person desiring to make application shall file with the Clerk of this Court for public inspection a statement revealing the detailed basis of his claim for compensation. The detailed statements shall, in general, be modeled upon the forms used in a Chapter X bankruptcy proceeding. In complying with this paragraph, the receiver shall be at liberty to file his final report.

Defendant corporations shall prepare and circulate to all known stockholders, by mail posted no later than Wednesday, December 17, 1958, the text of this opinion and the order embodied in the last paragraphs thereof.