**Gregory ROGERS, et al., Plaintiffs,**

**v.**

**ETOWAH COUNTY, et al., Defendants.**

**Civ. A. No. 88-C-1167-M.**

United States District Court,
N.D. Alabama, M.D.

Aug. 3, 1989.

John B. Morris, Jr., Bryan A. Stevenson, Atlanta, Ga., for plaintiffs.

Jack Floyd, Mary Ann Stackhouse, Floyd, Keener, Cusimano & Roberts, Gadsden, Ala., for Etowah County, Robert Hitt, Thomas Smith, Billy McKee, Jesse Burns, W.A. Lutes, Lawrence Presley, Billy Williams.

Donald R. Rhea, Rhea, Boyd, Rhea, Gadsden, Ala., for John Raley & James Hayes.

## MEMORANDUM OF OPINION

CLEMON, District Judge.

In this jail conditions lawsuit, the plaintiff class has moved for a preliminary injunction. At the hearing on the motion, counsel for the parties announced that they had tentatively agreed to a Consent Injunction, which has now been memorialized and presented to the Court. However, based on the evidence adduced at the hearing, the Court is yet unconvinced that the proposed decree is fair and adequate with respect to the class.

### FACTS

The Etowah County Jail ("the jail") is located in the County Courthouse Building in Gadsden, Alabama. It occupies four floors—male inmates occupying the second and fourth floors; and female inmates housed on the third floor. Inmates are housed in bullpens and side cells. The bullpens contain sixteen bunks each. Side cells have two bunks each.

There is a serious fire-safety problem at the jail. The problem emanates from the

fact that the locking mechanism is defective on over twenty-eight separate doors of the jail. In lieu of repairs to the locking mechanism, the defendants utilize chains and padlocks on the doors. In the event of a fire, staff members would have to unlock by hand all these padlocks and chains, and then crank open numerous cell doors before the inmates could be released. On July 15, 1988, the State Fire Marshall inspected the jail and concluded:

> If a fire were to occur in this facility with the number of inmates housed here, and the number of locks, and padlocks that would have to be unlocked by either one (1) or two (2) jailers, it is doubtful that the inmates could be removed without loss of life occurring. Corrective action must be carried out immediately to correct all violations noted. The State Fire Marshal's Office does not grant any permission or approval for operation of any jail where code violations exist.

A year later, no corrective action has been taken and the jail remains in operation sans Fire Marshal approval.

The jail is grossly understaffed. With an inmate population ranging between 90 to 130 inmates housed on three separate floors, three staff members per shift are regularly assigned to the jail—and occasionally only two staff persons service the jail. One staff member must always remain in the fourth floor control room; thus, when only two staff members are available, only one is available to patrol both the third and the fourth floor of the jail. Defendants concede that the staff is not able to constantly monitor the status of the intoxicated or potentially suicidal inmates.[1]

There is a fairly unique, but certainly unsatisfactory, system of notifying the staff of emergencies in the cells and bullpens. If, for example, the emergency occurs on the third floor, inmates of that floor, in the not-infrequent absence of staff, must bang on the ceiling or plumbing pipes to attract the attention of inmates on the fourth floor. The fourth floor inmates, in turn, bang on their walls to attract the attention of a staff person. When a staff member hears the noise, she checks with the fourth floor inmates to learn of the nature of the emergency on the third floor.

Generally, inmates are confined to their cells or bullpens twenty-four hours a day. Neither outdoor nor indoor exercise facilities are available for inmates of the Etowah County Jail.

The cells and bullpens are frequently overcrowded. In the bullpens, four bunks are stacked on top of each other, against the walls with the highest bunk over six feet above the concrete floor.[2] No ladders are provided to assist those inmates who must climb to the highest bunks.[3] While standard regulations require a space of at least three feet between bunks, at the Etowah County Jail this distance is only two feet (i.e., 22"–25"). Plaintiffs' expert witness testified that in his 265 visits to jails and prisons throughout the country and in over 48 years of penal administration, he has never seen another prison with quadruple bunking.[4]

Sometimes a greater number of inmates are placed in a particular cell or bullpen than the number of bunks therein. As many as twenty-one inmates have been confined to a bullpen with its sixteen-inmate capacity; as many as seven inmates have been confined to a cell with a capacity for only two. In these situations, the excess inmates are required to sleep on the floor at times immediately adjacent to the toilet and sink. During the night, inmates must step over each other to reach the toilet.

---

1. Last September, an inmate committed suicide while in the jail.

2. These units were designed to accommodate two bunks per wall.

3. Defendants concede that they have been informed that inmates have fallen and injured themselves while in the higher bunks or while attempting to climb to them.

4. The expert, Dr. Joseph R. Rowan, also testified that he has never seen another jail or prison which used padlocks as the principal security instrument.

Living conditions in the cells and bull-pens are appalling. The toilet and shower facilities are both old and unsanitary. Electrical wires and lighting fixtures are exposed. Between a third to forty percent (40%) of the lighting is "grossly substandard"—totally unsuited to reading. There is minimal air circulation and movement during the summer months; and the jail temperature sometimes rises to over 100 degrees. In the top bunks, the temperature is even higher. According to the expert, the atmosphere in the jail is "stifling."

The phenomenon of quadruple bunking at the jail facilitates the transmission of airborne communicable diseases such as tuberculosis and hepatitis.

Except for females, inmates charged with or convicted of misdemeanors are not housed separately from those charged with or convicted of felonies.

As of last week, three out of every four inmates at the Etowah County Jail have never been convicted. Nearly a third (32%) have never been indicted; another seventeen percent (17%) are being held on misdemeanor warrants. A fourth have been indicted but not tried. Pretrial detainees are not housed separately from convicted felons. Pretrial detainees sometimes spend over a year in jail between arrest and trial. On the average, there are ten (10) to twenty (20) inmates awaiting trial exclusively on misdemeanor charges or serving misdemeanor sentences.

## THE PROPOSED PRELIMINARY INJUNCTION BY CONSENT

The agreement between counsel for the class and the defendants provides some

immediate relief by requiring that at least three staff employees shall be on duty for each shift; after October 1, there will be four staff persons assigned during each shift. By November 1, the defendants shall have removed the fourth bunk in each cell where there is quadruple bunking. By the same date, a ceiling of 92 inmates shall be established for the jail population, except under emergency circumstances. If the 90–inmate cap is thereafter "repeatedly exceeded," the class may seek compliance from the Court. Also, by October 1, the locking mechanisms on the doors to the group cells shall have been repaired and chains and padlocks removed.

## STANDARD OF REVIEW

If this were ordinary litigation, the Court's role arguably would be simply to sign the "Preliminary Injunction By Consent" as submitted. *United States v. City of Miami, Florida,* 614 F.2d 1322 (5th Cir. 1980);[5] *vacated,* 664 F.2d 435 (5th Cir. 1981). But this is one of those special situations in which the trial court is required by rule to approve a preliminary settlement to which the parties have agreed.

For this is a class action, and under FRCP 23(e), it "shall not be dismissed or compromised without the approval of the court...."[6] Court approval must be based on a finding that the compromise is "fair, adequate, and reasonable." *United States v. City of Miami, Fla.,* 664 F.2d 435 (5th Cir.1981); *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).

5. In what can be termed 'ordinary litigation', that is, lawsuits brought by one private party against another private party that will not affect the rights of any other persons, settlement of the dispute is solely in the hands of the parties. If the parties can agree to terms, they are free to settle the litigation at any time, and the court need not and should not get involved. As Judge Wyzanski has described this situation: "the traditional view is that the judge merely resolves issues submitted to him by the parties ... and stands indifferent when the parties, for whatever reason commends itself to them, choose to settle

a litigation." *Heddendorf v. Goldfine,* 167 F.Supp. 915, 926 (D.Mass.1958).

Moreover, procedurally it would seem to be impossible for the judge to become involved in overseeing a settlement, because the parties are free at any time to agree to a resolution of the dispute by private contractual agreement, and to dismiss the lawsuit by stipulation. In this situation, then, the trial court plays no role in overseeing or approving any settlement proposals. *Id.* at 1330.

6. In addition, notice of any proposed compromise must be given to the class members.

Under the facts, the Court cannot in good conscience presently conclude that the agreed to preliminary injunctive relief is either fair, adequate, or reasonable. Three quarters of the class members are presumptively innocent of the charges pending against them. The only reason for their detention is to assure their presence at trial; and but for their lack of financial resources, they would be entitled to their freedom. Here, the defendants' confinement of plaintiff class members in an overcrowded, unsafe, unsanitary, and generally uninhabitable amount of space has "cause[d] them to endure genuine privations and hardships over an extended period of time." *Bell v. Wolfish*, 441 U.S. 520, 542, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1978). On the present state of the record, these conditions amount to "punishment"; and such punishment of pretrial detainees is forbidden by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* Every single day in which the plaintiff class members linger in these dangerous, squalid and scandalous conditions is but another day of punishment.

No plausible reasons have been advanced to justify the proposed two to three months' postponement of the class members' constitutional right to be free of punishment in the absence of a trial and conviction. Prior to this Court's granting its imprimatur to the proposed settlement, such justification must be given.

Accordingly, the defendants, by separate order, shall be directed to show cause, by 4:30 P.M. on Wednesday, August 9, 1989, why the effective dates for the relief specified in the "Preliminary Injunction By Consent" should not be advanced to September 4, 1989. The Court may thereafter schedule further hearings on the matter.

### ORDER TO SHOW CAUSE

Based on the accompanying Memorandum of Opinion, it is hereby ORDERED that defendants ETOWAH COUNTY, ALABAMA; ROBERT HITT, THOMAS SMITH, BILLY RAE MCKEE, JESSE BURNS, W. A. LUTES, LAWRENCE PRESLEY, and BILLY RAY WILLIAMS, individually and as members of the ETOWAH COUNTY COMMISSION; JAMES HAYES, individually and as Sheriff of Etowah County, Alabama; and JOHN RALEY, individually and as Chief of Corrections of Etowah County, Alabama, shall, not later than 4:30 P.M. on Wednesday, August 9, 1989, SHOW CAUSE IN WRITING to be filed with the Clerk of this Court the reasons, if any there be, why the effective dates for the relief specified in proposed Preliminary Injunction By Consent should not be advanced to September 4, 1989.