December 6, 1978

## 78-64    MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION

### National Aeronautics and Space Agency—Disposition of Items Carried by Astronauts on Space Flights

This responds to the inquiry of the National Aeronautics and Space Agency (NASA) General Counsel, which you forwarded to us, concerning the disposition of postal covers that several astronauts, acting with or without authorization, took on space flights and now held by NASA or the National Archives as custodian.[1] We conclude:

(1) With respect to postal covers the Apollo 15 astronauts took to the moon, a claim to the covers by NASA exists only with respect to those given by a third party to Astronaut Worden and taken by him to the moon for a commercial purpose.

(2) Should an astronaut sell a souvenir item authorized by NASA to be transported into space as a personal memento, an action by NASA in quasi-contract would lie for recovery of the astronaut's profits from the sale.

### I. Summary

The postal covers taken to the moon in July 1971 by the Apollo 15 astronauts and now in NASA's custody can be considered from the standpoint of three separate categories: Covers the astronauts purchased and took to the moon as mementos; covers they purchased or that were given to them by third parties, but not for commercial purposes, and subsequently transported with authorization; and covers given to Astronaut Worden that were intended for commercial exploitation. With respect to the Worden covers, his acceptance of the covers and failure to disclose to NASA their source and intended use resulted in a breach of fiduciary obligation to NASA that would, in the eyes of a court, render Worden a trustee on behalf of NASA.

---

[1] References in this memorandum to covers "in NASA's custody" pertain to covers in the actual possession of NASA or the National Archives.

We further conclude that any sale of covers or other souvenirs by the astronauts would constitute a form of unjust enrichment on the basis of which a claim in quasi-contract for the proceeds of the sale could lie. The prospect of such an action, which could not be used to retain the Worden covers themselves, might even in his case be the preferable means of discouraging commercial use of the covers because of uncertainties in applying a theory of fiduciary obligation to the facts presented.

## II. The Facts

NASA, through Donald Slayton, then its assistant director for flight crew operations, published regulations on August 18, 1965, permitting astronauts on space flights to take with them into space up to 8 ounces each of personal mementos, subject to Slayton's approval and the approval of the mission director for each flight. No declaration as to the source or intended use of any memento was required under this procedure. Among the items routinely approved and carried on subsequent space flights were a variety of postal covers—decoratively printed envelopes bearing stamps and special cancellations—that are popular philatelic souvenirs. For example, 279 such covers were carried, with approval, on Apollo flights 11, 13, and 14.

After the flight of Apollo 15, because of events detailed below, NASA asked its astronauts to turn over to it postal covers and other souvenir property pending an appraisal of the legal issues discussed in this memorandum. Although the discussion that follows applies to all such souvenirs, NASA has investigated only the facts surrounding the acquisition, transport, and disposition of the Apollo 15 souvenirs. Consequently, this memorandum will focus on those facts as garnered from memoranda describing the investigations into Apollo 15 by NASA, the U.S. Postal Service, and the Senate Committee on Aeronautical and Space Sciences.

On Apollo 15, astronauts David Scott, James Irwin, and Alfred Worden carried with them a total of 642 covers: 398 covers carried by Scott without prior authorization; 144 covers carried, with authorization, by Worden that were given to him by F. Herrick Herrick, a stamp collector and former film director; and 100 covers carried, with authorization, by the three astronauts to be used as gifts or mementos.

A. *The Unauthorized Covers.* The astronauts agreed to carry 400 specially cacheted covers at the suggestion of Horst Walter Eiermann, a German businessman, who, in turn, was acting on behalf of a German stamp dealer, Hermann Sieger.[2] The parties agreed that the astronauts would sell 100 covers to Eiermann for approximately $200 each and keep the remaining covers for their own use. The covers were designed by Scott, ordered from a commercial printing company, and paid for by the astronauts.[3] Before ordering the

---

[2] The astronauts agreed originally to carry covers to be supplied to them by Sieger, through Eiermann. Instead, the astronauts prepared the covers themselves.

[3] In addition to the covers to be taken to the moon, the astronauts ordered between 800 and 1,000 cacheted envelopes to be autographed on earth and distributed as flight souvenirs.

envelopes, Scott submitted his cachet design to Harold Collins, chief of the Kennedy Space Center Mission Support Office.

During the early morning of July 26, 1971, the Apollo 15 launch date, Collins, through a previous arrangement with Forrest Rhodes, chief of the Kennedy Space Center mail and distribution section, carried several hundred envelopes to the center's post office. Ten-cent stamps, purchased by the astronauts, were affixed to each cover, and the covers were canceled. Collins then delivered the covers to astronaut quarters.

James Smotherman, who was in charge of Apollo 15 flight support and responsible, among other things, for packaging the astronauts' personal items, instructed two assistants to vacuumpack the envelopes for transportation. He neglected to list the covers on Scott's "personal property preference list" because he confused the covers in question with another set of covers that had been listed and approved for transport earlier. Scott had not attempted to secure approval for the Eiermann covers; however, neither he nor either of the other astronauts instructed anyone not to list the covers, and Scott apparently made no attempt to conceal from NASA personnel the fact of the covers' existence. After packaging, the covers were given to Scott, who carried them aboard Apollo 15 in a pocket of his spacesuit.

Following the recovery of Apollo 15 and while aboard the recovery ship, U.S.S. *Okinawa*, the Apollo crew, with assistance from *Okinawa* crew members, affixed to the envelopes twin 8-cent "Space Achievement" postage stamps that the astronauts had paid for, and had the envelopes date-stamped in the ship's post office. During their flight home from Hawaii, the astronauts signed 100 covers, on the back of each of which appeared a notarized, typewritten certification that the covers had been landed on the moon. Later Scott mailed the 100 covers to Eiermann in Stuttgart, Germany.

Eiermann subsequently delivered the covers to Sieger, who retained 1, sold the remaining 99, and transferred DM 30,500 (roughly $10,000) to each of three bank accounts he had opened for the astronauts. The 99 covers sold for a total of approximately $150,000.

The astronauts, after receiving bankbooks for their German accounts, called Eiermann to inform him that they had decided to accept no money for the covers, and transmitted powers of attorney to enable him to close the accounts. They accepted his alternative offer of stamp collections for their children, but several months later, they also declined this offer.

Upon learning of the existence of the unauthorized covers, NASA, on June 30, 1972, impounded the 298 covers remaining in the astronauts' possession. (Despite the astronauts' plan to carry 400, 298 appears to be the number of covers actually carried.) The covers now in the National Archives' custody represent only the unauthorized covers the astronauts intended to keep for their own use.

Because of their actions, each astronaut was reprimanded; two were assigned to new positions, and one retired.

B. *The Worden Covers.* Worden carried with him, with authorization, 144 covers supplied by Herrick, who had had the covers designed and printed

283

through a New York advertising executive. Herrick paid for the envelopes, stamps, and printing, and for printed cards that were placed in the envelopes. Worden did not tell NASA, prior to flight of Apollo 15, of the source of the covers.

Both Herrick and Worden denied any agreement between them to compensate Worden for carrying the covers, and Worden has apparently received no money from the sale of any of them. However, Herrick did counsel Worden, prior to the flight, that taking such souvenirs to the moon would be a wise investment because of their value to stamp collectors.

The astronauts, following their recovery by the *Okinawa*, signed, stamped, and canceled the 144 covers. Of the 144, 16 were reported damaged or destroyed; Worden gave 28 to friends and sent 100 to Herrick, 70 of which were given, in turn, to a New York stamp dealer, who sold 10 covers, and, at Herrick's request turned 60 covers over to Worden. These 60 covers are now in the National Archives' custody.

C. *Other Authorized Covers.* Besides the 144 covers taken by Worden, Irwin and Scott carried an additional 100 authorized covers to be used for noncommercial purposes. Irwin carried 88 covers as a favor to a fellow astronaut, whose wife is a stamp collector. All 88 covers are reportedly in her possession. Irwin also carried eight covers bearing a shamrock insignia; two were given as gifts to Kennedy Space Center employees, and six were retained by Irwin, plus a single cover bearing a "First Man on the Moon" stamp and a "Bliss Centennial" 3-cent stamp. Scott carried, with authorization, a 1928 cover bearing Orville Wright's signature and two covers furnished by the U.S. Postal Service, one of which Scott canceled on the moon and one of which remained in the command module. The canceled envelope has been placed on public display by the Postal Service.

### III. Discussion

We have identified two questions on which NASA seeks the advice of this Office:

(1) Whether NASA has any claim to postal covers and other souvenirs that astronauts took into space and that are now in NASA's custody;

(2) The remedies, if any, available to NASA to prevent astronauts or former astronauts from profiting from the commercial exploitation of such souvenirs.

With respect to the first question as it applies to the Apollo 15 covers that NASA now holds, any claim by NASA to the covers themselves must rest on a property interest antedating the flight of Apollo 15, or on some equitable principle, the breach of which would make the astronauts constructive trustees for this specific property. Because none of the covers were purchased by public funds or prepared at public expense, NASA has no legal, as opposed to equitable, claim. Any claim must rest on a theory of constructive trusteeship.

At the time of the Apollo 15 flight, it was still routine NASA practice to

284

permit astronauts to take postal covers into space as personal mementos. There thus appears to be no breach of any equitable or other principle that would sustain a claim to any of the 100 covers taken into space, with authorization, by Scott and Irwin for noncommercial purposes. That 88 were given to Irwin by Astronaut Gordon and his wife does not alter this conclusion because no commercial use for the covers appears to have been intended. Nor did Irwin profit from his custody of the covers.

With respect to the 398 covers taken into space by Scott without authorization; three of the astronauts' actions may be deemed violations of some obligation to NASA: Scott's failure to secure authorization; the astronauts' failure to disclose the intended commercial use of 100 of the covers; and the astronaut's facilitation of the commercial exploitation of 100 of the covers. The second and third possible breaches of duty, however, would not sustain a claim to any of the 298 covers now held by NASA if it is assumed, as the evidence seems to indicate, that the astronauts intended to keep them as personal mementos. NASA might well have a colorable claim to the one cover retained by Sieger, who participated in any violation of duty that the astronauts committed. It appears, however, that the 99 other covers have passed to *bona fide* purchasers and are beyond NASA's reach.

As for the 298 unauthorized covers now in NASA's possession, the failure by Scott to secure authorization for the covers that were not intended for commercial use would not be a breach of any equitable principle on which a claim to the covers could be based. The violation of regulations appears inadvertent—Scott made no effort to conceal his possession of the covers. Further, Slayton has testified that he would have authorized transportation of the covers had a request been made. *Hearing on Commercialization of Items Carried by Astronauts Before the Senate Comm. on Aeronautical and Space Sciences*, 92d Cong., 2d sess. 59-60 (August 3, 1972) (statement of Donald Slayton to the committee in executive session; unpublished transcript). Although the weight of the covers, 30 ounces, exceeded the 8-ounce limit established in the 1965 regulations, that limit was based on the lesser capabilities of the Gemini spacecraft then in use; current proposed NASA regulations would permit each astronaut up to 1.5 pounds of souvenirs per flight. 43 F. R. 25693, 25694 (1978).

A colorable claim does exist, however, with respect to the 60 covers remaining from the 144 given by Herrick to Worden. Although Worden did not initiate his dealing with Herrick and did not profit from the sale of any covers, his mere acceptance of the covers, the commercial purpose of which is amply demonstrated by the evidence, may itself be deemed a breach of Worden's fiduciary obligation of complete loyalty to the interest of NASA, his principal, while employed as its agent.

It is fundamental that an agent owes his principal the loyalty of a fiduciary as to all matters within the scope of his employment. Restatement of Agency § 13 (1933). The duty of loyalty that the astronauts owed to NASA was codified in "Standards of Conduct for NASA Employees," 14 CFR § 1207.735-1 *et seq.* (1977), that were promulgated in October 1967, and governed the conduct of

the Apollo 15 astronauts. In relevant part, those regulations prohibited any commercial exploitation by a NASA employee of his position, 14 CFR §§ 1207.735-100(e)(1), (2), and (6); 1207.735-201(a) and (b)(2); 1207.735-605(a), (d); and, in particular, any outside employment that would involve the violation of Federal regulations, a conflict of interest, the use of NASA's name in connection with a privately sold product, or the use of Federal facilities, or any action that would otherwise reasonably cause unfavorable criticism of NASA or impair public confidence in the Agency, 14 CFR § 1207.735-303(a)-(d), (f)-(h). In merely accepting covers from Herrick, in the light of Herrick's commercial purposes, Worden arguably violated each of the foregoing regulations; insofar as the regulations reasonably define an astronaut's obligation of complete loyalty to his employer, those violations evidence a breach of fiduciary duty that would result in the imposition of a constructive trust over the covers themselves for NASA's benefit.

In a claim for the imposition of a constructive trust, no actual damage need be shown:

> It is immaterial that the profit was not made at the expense of the beneficiary or principal; it is immaterial that if the fiduciary had not made the profit it would have been made and could have been retained by someone else. The constructive trust which is imposed is based upon the broad principle that a fiduciary must act with an eye single to the interest of his beneficiaries. If he were permitted to keep a profit made by him in connection with the performance of his duties as fiduciary, he would be tempted to consider his own interest and not merely that of the beneficiary. He will not be permitted to put himself in a position where there is a conflict between his self-interest and the interest of the beneficiaries.  ·

5 Scott, *Law of Trusts* § 502, at 3555 (3d ed., 1967). *See also, United States* v. *Carter*, 217 U.S. 286 (1910); *Byer* v. *International Paper Co.*, 314 F. (2d) 831 (10th Cir. 1963); *United States* v. *Bowen*, 290 F. (2d) 40 (5th Cir. 1961). The "single-minded devotion" theory of fiduciary obligation has been cited with approval by courts in suits to recoup profits for the Government that were reaped by Government employees, who, during the course of their employment, had engaged in compromising outside activities. *United States* v. *Carter*, 217 U.S. 286 (1910); *United States* v. *Podell*, 572 F. (2d) 31 (2d Cir. 1978); *United States* v. *Drumm*, 329 F. (2d) 109 (1st Cir. 1964); *United States* v. *Bowen*, 290 F. (2d) 40 (5th Cir. 1961).

In Worden's case it may be that the doctrine of constructive trusteeship does not apply because (1) the taking of the covers was not within the scope of his employment, and (2) the benefit conferred on him by Herrick could not lawfully have been realized by NASA in the absence of Worden's acts. Scant case law attempts to analyze these problems directly. Professor Scott discusses a leading decision by the British House of Lords, holding that the Crown could recover bribes received by a British army sergeant in Cairo, who enabled a lorry to pass civilian police without inspection by escorting it through the city

while in uniform. Notwithstanding the objections noted above to the imposition of a constructive trust and the Crown's inability to show any loss in this case, the Lords held that the Crown was entitled to any profit that the sergeant reaped by the use of his uniform and pretended authority. *Reading* v. *Attorney General*, [1951] A.C. 507, *aff'g Reading* v. *The King*, [1949] 2 K.B. 232, *aff'g* [1948] 2 K.B. 268 (discussed in 5 Scott, *Law of Trusts*, § 502 at 3556 (3d ed. 1967)).

Similarly, the second circuit recently held that the Government's complaint against a former Congressman, alleging his receipt of unlawful legal fees and campaign contributions, was sufficient to state a claim for the imposition of a constructive trust on the money he received. *United States* v. *Podell*, 572 F. (2d) 31 (2d Cir. 1978); *see also, Fuchs* v. *Bidwell*, 31 Ill. App. (3d) 567, 334 N.E. 2d 117 (1975), *rev'd on other grounds*, 65 Ill. (2d) 503, 359 N.E. (2d) 158 (1976). The results in both cases are sensible because, despite what would have been the respective Governments' inability to obtain the profits in question themselves, the balance of equities between the innocent principals and their wrongdoing agents unquestionably favored the principals.

Two further uncertainties arise in extending traditional fiduciary principles to the unusual facts of the Worden case; we conclude, however, although no precedent squarely resolves these uncertainties, that, because of the policy inherent in the concept of fiduciary obligations neither problem would preclude a successful suit in equity.

First, it might be argued that Worden's disloyal intent notwithstanding, his intent, at the moment he accepted Herrick's covers, had not yet materialized into a disloyal act compromising the performance of Worden's official duties. Those breaches that courts penalize by the imposition of constructive trusts involve acts manifestly in conflict with a trust beneficiary's interests, or where the profits unlawfully received represent an apparent incentive for trustees to perform their duties without full attention to their principals' interests, *e.g.*, acts adverse to the principals' financial interest, *Byers* v. *International Paper Co.*, 314 F. (2d) 831 (10th Cir. 1963); acts that deprive the principal of a business opportunity, *Community Counselling Service, Inc.* v. *Reilly*, 317 F. (2d) 239 (4th Cir. 1963); *County of Lake* v. *X-PO Security Police Service, Inc.*, 27 Ill. App. (3d) 750, 327 N.E. (2d) 96 (1975); unauthorized exploitation of information obtained through the purported trustee's employment, *Hunter* v. *Shell Oil Co.*, 198 F. (2d) 485 (5th Cir. 1952); or acts that create the appearance of a conflict of interest or the possibility that the activity involved will compromise the employee's judgment in the exercise of his duties, *United States* v. *Carter*, 217 U.S. 286 (1910); *United States* v. *Podell*, 572 F. (2d) 31 (2d Cir. 1978); *United States* v. *Drumm*, 329 F. (2d) 109 (1st Cir. 1964). However, Worden's act need not have conflicted with his tasks in getting to the moon and back in order to have constituted a violation of his duty of undivided loyalty to NASA. His acceptance of the covers from a commercially interested party, which, once disclosed, foreseeably compromised his employer's good name and reputation, sufficiently conflicted with the interests of NASA so as to justify the imposition of a constructive trust in this case.

287

A second question is whether Worden had title to the Herrick covers at the time they were given to him. For a trust to be imposed with respect to any property, the disposition of property must constitute profit to the trustee in violation of his fiduciary duties. Worden or Herrick could conceivably argue that, assuming a plan to permit Herrick to sell the covers, the covers, at the time of their transfer to Worden, were only a loan to Worden and that their transfer alone represented no gain to the astronaut. The facts, however, belie any loan characterization. Worden was able, apparently without dispute, to dispose of 28 of the covers, of his own accord, as postflight gifts. Further, at Worden's request, Herrick secured the return to Worden of 60 unsold covers from the stamp dealer Siegel. These acts are consistent only with Worden's ownership of the covers at the time Herrick delivered them to him.

An alternative approach that would apply as well to covers in the hands of other astronauts would be legal action to recover, instead of the souvenirs, any profits the astronauts might realize from their sale. In the event of a sale, the relevant case law suggests several theories on which a claim of "unjust enrichment" may be based. Under any theory, a claim of unjust enrichment asserts that profits accrued to the defendant through some wrongful act, and the defendant should, therefore, be compelled to disgorge his profits. 5 Scott, *Law of Trusts* § 462.2 (3d ed. 1967); Second Restatement of Agency § 404A (1958). Case law and secondary authority suggest three theories under which the enrichment of the astronauts can be deemed wrongful; the policy considerations underlying the three theories clearly converge:

A. *Unjust Enrichment Through Violations of Quasi-Contractual Duties.* Regardless of whether those of NASA's regulations cited above accurately define the astronauts' fiduciary obligations, they do represent duly promulgated regulations that would be violated by the astronauts' commercial exploitation of their souvenirs. Official duties imposed by statute or regulation are quasi-contractual in nature. *Cf., Steamship Co.* v. *Joliffe,* 69 U.S. (2 Wall.) 450 (1864); *NLRB* v. *Killoran,* 122 F. (2d) 609 (8th Cir. 1941), cert. denied, 314 U.S. 696 (1941); *In re Shawsheen Dairy,* 47 F. Supp. 494 (D. Mass. 1942) [per Wyzanski, D.J.]. Where a defendant profits from his violation of a quasi-contractual obligation, he is liable to the party to whom he owed his duty for the profits realized.

B. *Unjust Enrichment Through Use of the Principal's Assets.* Whatever value inheres in souvenirs that were taken to the moon clearly could not have been realized without the use of NASA's facilities and equipment. Section 404 of the Second Restatement of Agency (1958) states that where the use of a principal's assets is predominantly responsible for producing a profit for the principal's agent, the agent is liable, at the principal's election, for all profits thus realized.

C. *Unjust Enrichment at NASA's Expense.* Under the basic principle of restitution, one who is unjustly enriched at the expense of another is required to compensate the other for his loss. Restatement of Restitution § 1 (1937). However, where the profiteering violates some independent equitable principle, for example, the obligations of a fiduciary, the measure of restitution will

be the entire profit realized by the defendant and not the value of the plaintiff's loss. Restatement of Restitution, §§ 138, 197 (1937); *cf., Heddendorf* v. *Goldfine*, 167 F. Supp. 915 (D. Mass. 1958). This theory is essentially the same as the theory advanced above for the recovery of Worden's covers, but views the proceeds of a sale rather than the covers as trust property in the hands of the astronauts. The application of the theory to recover the profits from any sale is more straightforward, under these facts, than the attempt to retain the covers themselves. First, assuming that a breach of duty through such a sale can be shown, there is no question after a sale as to whether the astronaut in question has profited from his breach. Second, where an astronaut sells his souvenirs—creating the possibility that NASA's name and reputation may be exploited by private parties for personal gain—a plainer case of a potential conflict of interests appears than in the case of the initial acceptance of covers from a private party. This theory, however, can be used to restrain sales by astronauts only as long as they are employed by NASA; the termination of employment ends their duty of loyalty to NASA's interests, and fiduciary obligations no longer apply.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*